**CHURCH OF SCIENTOLOGY INTERNATIONAL,**
Plaintiff,

v.

**TIME WARNER, INC., Time Inc. Magazine Company, and Richard Behar, Defendants.**

No. 92 Civ. 3024 (PKL).

United States District Court,
S.D. New York.

July 16, 1996.

Morrison Cohen Singer & Weinstein, LLP, New York City (Jonathan W. Lubell, of counsel), for Plaintiff.

Cahill Gordon & Reindel, New York City (Floyd Abrams, Dean Ringel, David G. Januszewski, James R. Oswald, of counsel), for Defendants.

## OPINION AND ORDER

LEISURE, District Judge:

Defendants moved for summary judgment in this libel action, which the Court granted in part and denied in part. *See Church of Scientology Int'l v. Time Warner, Inc.*, 903 F.Supp. 637 (S.D.N.Y.1995). Defendants then moved for reargument and reconsideration, arguing that the Court should have granted summary judgment in full because the sole remaining statement sued upon is nonactionable based on the incremental harm doctrine. After reargument, and upon reconsideration, for the reasons stated below, the Court grants summary judgment as to the sole remaining statement in the case and dismisses the case in its entirety.

## BACKGROUND

In 1992, *Time* magazine published a 10 page, 7500 word article entitled "Scientology: The Cult of Greed" (the "Article"). The Article was highly critical of Scientology, and included such statements as:

"For nearly 40 years, the big business of Scientology has shielded itself exquisitely behind the First Amendment...."

"In reality the church is a hugely profitable global racket that survives by intimidating members and critics in a Mafia-like manner."

"Many of the group's followers have been accused of committing financial scams, while the church is busy attracting the unwary through a wide array of front groups in such businesses as publishing, consulting, health care and even remedial education."

"Says Cynthia Kisser, the [Cult Awareness Network's] Chicago-based executive director: 'Scientology is quite likely the most ruthless, the most classically terroristic, the most litigious and the most lucrative cult the country has ever seen. No cult extracts more money from its members.' Agrees Vicki Aznaran, who was one of Scientology's six key leaders until she bolted from the church in 1987: 'This is a criminal organization, day in and day out. It makes Jim and Tammy [Bakker] look like kindergarten.'" (alteration in original)

"Today the church invents costly new services with all the zeal of its founder."

"To pay their fees, newcomers can earn commissions by recruiting new members, become auditors themselves ..., or join the church staff and receive free counseling in exchange for what their written contracts describe as a 'billion years' of labor. 'Make sure that lots of bodies move through the shop,' implored [founder] Hubbard in one of his bulletins to officials. 'Make money. Make more money. Make others produce so as to make money ... However you get them in or why, just do it.'" (second omission in original)

"To gain influence and lure richer, more sophisticated followers, Scientology has lately resorted to a wide array of front groups and financial scams."

"Over five months, the Gearys say, they spent $130,000 for services, plus $50,000 for 'gold-embossed, investment-grade' books signed by Hubbard. Geary contends that Scientologists not only called his bank to increase his credit-card limit but also forged his signature on a $20,000 loan application."

"HealthMed, a chain of clinics run by Scientologists, promotes a grueling and excessive system of saunas, exercise and vitamins designed by Hubbard to purify the body. Experts denounce the regime as quackery and potentially harmful, yet HealthMed solicits unions and public agencies for contracts."

"Hubbard's purification treatments are the mainstay of Narconon, a Scientology-run chain of 33 alcohol and drug rehabilitation centers—some in prisons under the name 'Criminon'—in 12 countries. Narconon, a classic vehicle for drawing addicts into the cult, now plans to open what it calls the world's largest treatment center...."

"Three Florida Scientologists, including Ronald Bernstein, a big contributor to the church's international 'war chest,' pleaded guilty in March to using their rare-coin dealership as a money laundry. Other notorious activities by Scientologists include making the shady Vancouver stock exchange even shadier (*see box*) and plotting to plant operatives in the World Bank, International Monetary Fund and Export–Import Bank of the U.S. The alleged purpose of this scheme: to gain inside information on which countries are going to be denied credit so that Scientology-linked traders can make illicit profits by taking 'short' positions in those countries' currencies."

"The Feshbachs command a staff of about 60 employees and claim to have earned better returns than the Dow Jones industrial average for most of the 1980s. And, they say, they owe it all to the teachings of Scientology, whose 'war chest' has received more than $1 million from the family. The Feshbachs also embrace the church's tactics; the brothers are the terrors of the stock exchanges. In congressional hearings in 1989, the heads of several companies claimed that Feshbach operatives had spread false information to government agencies and posed in various guises—such as a Securities and Exchange Commission official—in an effort to discredit their companies and drive the stocks down."

"Scientology mischiefmaking has even moved to the book industry.... Scientology has sent out armies of its followers to buy the group's books at such major chains as B. Dalton's and Waldenbooks to sustain the illusion of a best-selling author. A former Dalton's manager says that some books arrived in his store with the chain's price stickers already on them, suggesting that copies are being recycled."

"Scientology devotes vast resources to squelching its critics."

"Those who criticize the church—journalists, doctors, lawyers and even judges—often find themselves engulfed in litigation, stalked by private eyes, framed for fictional crimes, beaten up or threatened with death."

"One of Scientology's main strategies is to keep advancing the tired argument that the church is being 'persecuted' by anti-religionists. It is supported in that position by the American Civil Liberties Union and the National Council of Churches. But in the end, money is what Scientology is all about. As long as the organization's opponents and victims are successfully squelched, Scientology's managers and lawyers will keep pocketing millions of dollars by helping it achieve its ends."

The Church of Scientology International ("CSI") filed a complaint for libel against defendants, challenging as false and defamatory several statements from the Article. The statements, numbered by the Court but otherwise as set forth in the complaint, are as follows:

1. "[T]he Church ... survives by intimidating members and critics in a Mafia-like manner."

2. "Scientology is quite likely the most ruthless, the most classically terroristic ... cult the country has ever seen."

3. "Those who criticize the church—journalists, doctors, lawyers and even judges—often find themselves framed for fictional crimes, beaten up or threatened with death."

4. "Occasionally a Scientologist's business antics land him in jail. Last August a former devotee named Steven Fishman began serving a five-year prison term in Florida. His crime: stealing blank stock confirmation slips from his employer, a major brokerage house, to use as proof that he owned stock entitling him to join dozens of successful class-action lawsuits. Fishman made roughly $1 million this way from 1983 to 1988 and spent as much as 30% of the loot on Scientology books and tapes. Scientology denies any tie to the Fishman scam, a claim strongly disputed by both Fishman and his longtime psychiatrist, Uwe Geertz, a prominent Florida hypnotist. Both men claim that when arrested, Fishman was ordered by the Church to kill Geertz and then do an 'EOC,' or end of cycle, which is Church jargon for suicide."

5. "One source of funds for the Los Angeles-based church is the notorious, self-regulated stock exchange in Vancouver, British Columbia, often called the scam capital of the world." ·

6. "Baybak, 49, who runs a public relations company staffed with Scientologists, apparently has no ethics problem with engineering a hostile takeover of a firm he is hired to promote."

7. " 'What these guys do is take over companies, hype the stock, sell their shares, and then there's nothing left....' " " 'They stole this man's property.' " [Referring to William Jordan.]

8. "THE LOTTICKS LOST THEIR SON, Noah, who jumped from a Manhattan hotel clutching $171, virtually the only money he had not yet turned over to Scientology. His parents blame the church and would like to sue but are frightened by the organization's reputation for ruthlessness."

9. "His death inspired his father Edward, a. physician, to start his own investigation of the church. 'We thought Scientology was something like Dale Carnegie,' Lottick says. 'I now believe it's a school for psychopaths. Their so-called therapies are manipulations. They take the best and brightest people and destroy them.' "

10. "It was too late. 'From Noah's friends at Dianetics' read the card that accompanied a bouquet of flowers at Lottick's funeral. Yet no Scientology staff members bothered to show up."

11. "The next month the Rowes flew to Glendale, Calif., where they shuttled

daily from a local hotel to a Dianetics center. 'We thought they were brilliant people because they seemed to know so much about us,' recalls Dee. 'Then we realized our hotel room must have been bugged.' After bolting from the center, $23,000 poorer, the Rowes say, they were chased repeatedly by Scientologists on foot and in cars."

12. "In a court filing, one of the cult's many entities—the Church of Spiritual Technology—listed $503 million in income just for 1987."

By Opinion and Order dated November 23, 1992, this Court granted defendants' motion to dismiss plaintiff's claims regarding certain statements in the complaint, on the grounds that they could not be read as referring to plaintiff. *See Church of Scientology Int'l v. Time Warner, Inc.,* 806 F.Supp. 1157 (S.D.N.Y.1992). Specifically, the Court found that parts of paragraph 4 and paragraphs 6, 7, 11, and 12 above do not allege statements that could reasonably be considered to be of and concerning CSI.

By Opinion and Order dated November 15, 1995, this Court granted summary judgment for defendants as to paragraphs 1–4 and 8–10 above on the grounds that no reasonable jury could find that these statements were published with malice. *See Church of Scientology Int'l v. Time Warner, Inc.,* 903 F.Supp. 637 (S.D.N.Y.1995). Thus the only statement remaining in the case is paragraph 5 above. Defendants moved for reargument of the motion for summary judgment on the grounds that the Court overlooked their argument that the claim regarding paragraph 5 above should be dismissed based on the incremental harm doctrine. The Court granted the motion for reargument and accepted further briefing on the question of summary judgment as to paragraph 5 above based on the doctrine of incremental harm.

## DISCUSSION

I. *Distinctions Between the Libel–Proof Plaintiff, Incremental Harm, and Subsidiary Meaning Doctrines*

There are three relevant related doctrines under which courts have granted judgment for defendants in libel suits: (1) the libel-proof plaintiff doctrine, (2) the incremental harm doctrine, and (3) the subsidiary meaning doctrine. Because these separate doctrines have not always been distinguished, and because the terms are not used consistently, some definition of the doctrines for purposes of this Opinion is in order.

■ The libel-proof plaintiff doctrine reasons that when a particular plaintiff's reputation for a particular trait is sufficiently bad, further statements regarding that trait, even if false and made with malice, are not actionable because, as a matter of law, the plaintiff cannot be damaged in his reputation as to that trait. *See, e.g., Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 303 (2d Cir. 1986) (holding that plaintiff's reputation regarding adultery rendered him libel proof as to allegations of adultery, even though allegations related to a time period when plaintiff was no longer married, and hence was no longer committing adultery), *cert. denied,* 479 U.S. 1091, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987); *Cardillo v. Doubleday & Co., Inc.,* 518 F.2d 638, 639–40 (2d Cir.1975) (holding that plaintiff, a habitual criminal, was libel proof as to allegations of criminal activity at issue, because his existing reputation created by past indictments and convictions could not be worsened by the alleged false statements).

■ The incremental harm doctrine reasons that when unchallenged or nonactionable parts of a particular publication are damaging, another statement, though maliciously false, might be nonactionable on the grounds that it causes no harm beyond the harm caused by the remainder of the publication. *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 522, 111 S.Ct. 2419, 2435–36, 115 L.Ed.2d 447 (1991); *Simmons Ford, Inc. v. Consumers Union of U.S., Inc.,* 516 F.Supp. 742, 750 (S.D.N.Y.1981) (Weinfeld, J.) ("Given the abysmal performance and safety evaluations detailed in the article, plaintiffs could not expect to gain more than nominal damages based on the addition to the article of the misstatement relating to federal safety standards."). The incremental harm doctrine "thus measures the incremental harm inflicted by the challenged state-

ments beyond the harm imposed by the rest of the publication. If that harm is determined to be nominal or nonexistent, the statements are dismissed as not actionable." *Herbert v. Lando*, 781 F.2d 298, 311 (2d Cir.), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986).

■ The subsidiary meaning doctrine reasons that where a maliciously false statement implies the same ultimate conclusion as that of the remainder of the publication, which has been published without actual malice, a plaintiff cannot "base his defamation action solely on inaccuracies contained within statements subsidiary to these larger views." *Id.* Thus, having determined one or more ultimate conclusions of the publication, and determined that those conclusions were not published with actual malice, a court must grant summary judgment for the defendant where the minor inaccuracies sued upon are subsidiary to one of the larger views which is nonactionable. *See* Jay Framson, Note, *The First Cut is the Deepest, but the Second May Be Actionable: Masson v. New Yorker Magazine, Inc. and the Incremental Harm Doctrine*, 25 Loy.L.A.L.Rev. 1483, 1516 n. 233, 1517 n. 237 (1992).

## II. *Application of the Three Doctrines*

### A. *The Libel–Proof Plaintiff Doctrine*

■ Dismissal based on the libel-proof plaintiff doctrine is not appropriate at this stage of the litigation, because it requires the Court to make factual findings regarding plaintiff's reputation for a particular trait. In addition, the doctrine has been persuasively criticized by then-Judge Scalia's opinion in *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568 (D.C.Cir.1984) ("To begin with, we cannot envision how a court would go about determining that someone's reputation had already been 'irreparably' damaged—*i.e.*, that *no* new reader could be reached by the freshest libel." (emphasis in original)), *vacated on other grounds*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. *The Incremental Harm Doctrine*

■ The proposition that the incremental harm doctrine is grounded in the First Amendment has been rejected by the Supreme Court in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. at 523, 111 S.Ct. at 2436. In addition, the doctrine requires a court to measure the harm flowing from the challenged statement as compared to the harm flowing from the rest of the publication, *see id.*, and the parties have not yet conducted discovery on the issue of damages.

■ Because the Court finds, as a corollary to the actual malice requirement of the First Amendment to the United States Constitution, that the subsidiary meaning doctrine bars suit on statements the implication of which, if itself published, is nonactionable, *see infra* Part II.C, the Court need not reach the question of which state law governs this suit, nor the question of whether the incremental harm doctrine bars recovery as a matter of state law.

### C. *The Subsidiary Meaning Doctrine*

■ In contrast to the incremental harm doctrine, the subsidiary meaning doctrine has not been rejected by the Supreme Court, and thus, under *Herbert v. Lando*, 781 F.2d 298 (2d Cir.), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986), is still the law in this Circuit. *See also Masson v. New Yorker Magazine, Inc.*, 895 F.2d 1535, 1565–66 (9th Cir.1989) (Kozinski, J., dissenting) (stating that the subsidiary meaning doctrine set forth in *Herbert* is "very different" from the "stillborn" incremental harm doctrine, "and quite unexceptional"), *rev'd*, 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *Liberty Lobby, Inc.*, 746 F.2d at 1568 n. 6 (Scalia, J.) ("[A]t some point the erroneous attribution of incremental evidence of a character flaw of a particular type which is in any event amply established by the facts is not derogatory."). In addition, unlike the incremental harm doctrine, the subsidiary meaning doctrine does bear on the First Amendment issue of actual malice, because if a minor inaccuracy could be grounds for libel, where the ultimate conclusion which the inaccuracy supports could not be because it is published without actual malice, the protection afforded to freedom of speech by the requirement that a plaintiff prove actual malice would be undermined. *See* Erin Daly,

The Incremental Harm Doctrine: Is There Life After Masson?, 46 Ark.L.Rev. 371, 385–86 (1993) (arguing that if one statement were privileged as based on court documents, and another minor statement could be sued upon, the privilege would be undermined). Compare Masson, 501 U.S. at 523, 111 S.Ct. at 2436 ("The question of incremental harm does not bear upon whether a defendant has published a statement with knowledge of falsity or reckless disregard of whether it was false or not.").

■ Accordingly, the Court must determine whether paragraph 5 above is subsidiary to the nonactionable views published in the remainder of the Article. See Herbert, 781 F.2d at 312 ("[W]e hold that if the appellees' published view that Herbert lied about reporting war crimes was not actionable, other statements—even those that might be found to have been published with actual malice—should not be actionable if they merely imply the same view, and are simply an outgrowth of and, subsidiary to those claims upon which it has been held there can be no recovery."). This determination need not be based on statements proven, or conceded, to be true, see id., but may be based on statements that are either unchallenged, see Simmons Ford, Inc., 516 F.Supp. at 750 (considering the challenged statement in light of the meaning conveyed by the remainder of article), or nonactionable, see Herbert, 781 F.2d at 312 (holding that where implication of challenged statement is same as implication of statements which, although possibly false, were not published with actual malice, challenged statement is nonactionable under subsidiary meaning doctrine). See Erin Daly, The Incremental Harm Doctrine: Is There Life After Masson?, 46 Ark.L.Rev. 371, 385–86 (1993).

■ As demonstrated by the quotations set forth in the Background section of this Opinion and Order, the Article, "Scientology: Cult of Greed" asserts, among other things, that Scientology, rather than being a bona fide religion, is in fact organized for the purpose of making money by means legitimate and illegitimate. The Article details various alleged schemes that the church allegedly uses to increase its revenues, including charging ever-increasing fees to its members, deceiving non-members through the use of front groups, manipulating securities and currency markets through the use of inside information, and evading taxes. It also criticizes the church on various other subjects, including the validity of its belief system, the harmfulness of its methods of counseling, and its tactics of combatting critics. These statements were either not challenged by plaintiff or were held to be nonactionable by the Court on the grounds that no reasonable jury could find that they were published with actual malice. The sole statement still at issue in the case ("One source of funds for the Los Angeles-based church is the notorious, self-regulated stock exchange in Vancouver, British Columbia, often called the scam capital of the world.") merely implies the same view which this Court has held to be nonactionable as not made with actual malice: that Scientology's purpose is making money by means legitimate and illegitimate. Accordingly, the claim based on this statement must be dismissed as subsidiary to a nonactionable view expressed in the Article.

### CONCLUSION

For the reasons stated above, upon reconsideration, the Court HEREBY GRANTS summary judgment for the defendants on the sole remaining statement sued upon. The action is dismissed.

**SO ORDERED.**