**CHURCH OF SCIENTOLOGY INTERNATIONAL, Plaintiff–Counter–Defendant–Appellant,**

v.

**Richard BEHAR, Defendant–Counter–Claimant–Appellee,**

**Time Warner, Inc., Time Inc. Magazine Company, Defendants–Appellees.**

**Nos. 98–9522(L), 99–7332(CON).**

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1999.

Decided Jan. 12, 2001.

Burt Neuborne, Eric M. Lieberman, Andrew J. Fields, Scott T. Johnson, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York, NY, for Plaintiff–Counter–Defendant–Appellant.

Floyd Abrams, Dean Ringel, Janet A. Beer, Cahill Gordon & Reindel, Robin Bierstedt, Time Inc., New York, NY, for

Defendant–Counter–Claimant–Appellee and Defendant–Appellees.

Before JOHN M. WALKER, Jr., Chief Judge, CABRANES and PARKER, Circuit Judges.

JOHN M. WALKER, Jr., Chief Judge:

Plaintiff-appellant Church of Scientology International ("CSI") appeals from judgments of the district court for the Southern District of New York (Peter K. Leisure, *District Judge* ) dismissing appellant's libel complaint. Because we find that the challenged statements were not published with actual malice or were subsidiary in meaning to statements made without actual malice, we affirm the judgments of the district court.

## BACKGROUND

On May 6, 1991, *Time* magazine published a 10–page, 7500–word cover article entitled "Scientology: The Cult of Greed" (the "Article"). The Article, written by defendant-appellee Richard Behar ("Behar"), was highly critical of Scientology, which it described as "pos[ing] as a religion" but being "really a ruthless global scam," and narrated various instances of wrongdoing by a number of individual Scientologists. CSI filed a complaint alleging libel against Behar and defendants-appellees Time Inc. Magazine Co. and its parent company Time Warner, Inc. (collectively, "Time"). The complaint alleged as false and defamatory the following statements from the Article:

### Paragraph 40 of the Complaint

1. "[T]he church . . . survives by intimidating members and critics in a Mafia-like manner."

2. " 'Scientology is quite likely the most ruthless, the most classically terroristic . . . cult the country has ever seen.' "

3. "Those who criticize the church— journalists, doctors, lawyers and even judges—often find themselves . . . framed for fictional crimes, beaten up or threatened with death."

### Paragraph 45 of the Complaint

4. "Occasionally a Scientologist's business antics land him in jail. Last August a former devotee named Steven Fishman began serving a five-year prison term in Florida. His crime: stealing blank stock confirmation slips from his employer, a major brokerage house, to use as proof that he owned stock entitling him to join dozens of successful class-action lawsuits. Fishman made roughly $1 million this way from 1983 to 1988 and spent as much as 30% of the loot on Scientology books and tapes."

"Scientology denies any tie to the Fishman scam, a claim strongly disputed by both Fishman and his longtime psychiatrist, Uwe Geertz, a prominent Florida hypnotist. Both men claim that when arrested, Fishman was ordered by the church to kill Geertz and then do an 'EOC,' or end of cycle, which is church jargon for suicide."

### Paragraph 52  of the Complaint

5. "One source of funds for the Los Angeles-based church is the notorious, self-regulated stock exchange in Vancouver, British Columbia, often called the scam capital of the world."

6. "Baybak, 49, who runs a public relations company staffed with Scientologists, apparently has no ethics problem with engineering a hostile takeover of a firm he is hired to promote."

7. " 'What these guys do is take over companies, hype the stock, sell their shares, and then there's nothing left. . . .' "
" . . . 'They stole this man's property.' "

### Paragraph 58  of the Complaint

8. "THE LOTTICKS LOST THEIR SON, Noah, who jumped from a Manhattan hotel clutching $171, virtually the only money he had not yet turned over to Scientology. His parents blame the

church and would like to sue but are frightened by the organization's reputation for ruthlessness."

9. "His death inspired his father Edward, a physician, to start his own investigation of the church. 'We thought Scientology was something like Dale Carnegie,' Lottick says. 'I now believe it's a school for psychopaths. Their so-called therapies are manipulations. They take the best and brightest people and destroy them.'"

10. "It was too late. 'From Noah's friends at Dianetics' read the card that accompanied a bouquet of flowers at Lottick's funeral. Yet no Scientology staff members bothered to show up."

### Paragraph 62   of the Complaint

11. "The next month the Rowes flew to Glendale, Calif., where they shuttled daily from a local hotel to a Dianetics center. 'We thought they were brilliant people because they seemed to know so much about us,' recalls Dee. 'Then we realized our hotel room must have been bugged.' After bolting from the center, $23,000 poorer, the Rowes say, they were chased repeatedly by Scientologists on foot and in cars."

### Paragraph 67   of the Complaint

12. "In a court filing, one of the cult's many entities—the Church of Spiritual Technology—listed $503 million in income just for 1987."

In June of 1992, the defendants moved to dismiss the complaint on the grounds that the statements, none of which mentioned CSI by name, were not of and concerning CSI. On November 23, 1992, the district court granted the motion to dismiss in part, finding that certain of the statements complained of could not be read as referring to CSI. *Church of Scientology Int'l v. Time Warner, Inc.*, 806 F.Supp. 1157 (S.D.N.Y.1992) (*"Time I"*). Specifically, the court found that parts of statement 4 and all of statements 6, 7, 11, and 12 could not reasonably be considered to be of and concerning CSI. *See id.* at

1162–64. Defendants then answered the complaint, and Behar asserted counterclaims against CSI for harassment and violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681. The parties agreed to focus discovery on the issue of actual malice and to defer discovery on the issue of truth and falsity.

After two and a half years of discovery, the district court granted summary judgment to defendants as to all of the remaining statements, except for statement 5, on the grounds of lack of actual malice. *Church of Scientology Int'l v. Time Warner, Inc.*, 903 F.Supp. 637, 642–44 (S.D.N.Y.1995) (*"Time II"*). On reconsideration, the district court granted summary judgment to defendants on statement 5, that the Vancouver Stock Exchange (the "VSE") was one source of funds for the church (the "VSE statement"), based on the subsidiary meaning doctrine, and dismissed the complaint. *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F.Supp. 589, 595 (S.D.N.Y. 1996) (*"Time III"*).

CSI then moved for an order modifying the district court's opinion in *Time III*, arguing that it was now stating a claim for nominal damages, for which it did not need to prove actual malice. The district court declined to address the merits of the claim because it found CSI's motion to be a procedurally defective motion for reargument. *Church of Scientology Int'l v. Time Warner, Inc.*, No. 92 Civ. 3024, 1997 WL 538912, at *2 (S.D.N.Y. Aug. 27, 1997) (*"Time IV"*).

On September 9, 1997, CSI moved for leave to amend the complaint to assert a claim for nominal damages premised on a finding that the disputed statements were demonstrably false. The district court denied the motion, holding that allowing CSI to amend its complaint five years after it brought the action, and after summary judgment had been granted against it, would be unduly prejudicial to the defendants. *Church of Scientology Int'l v. Time Warner, Inc.*, 1998 WL 575194, at *3

(S.D.N.Y. Sept. 9, 1998) (*"Time V"*). The district court also held that amendment would be futile, since a public figure claiming even nominal damages is still required to demonstrate actual malice under *New York Times Co. v. Sullivan*, 376 U.S. 254, 297–98, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See Time V*, 1998 WL 575194, at *4–5. Although Behar's counterclaims were still pending, the parties agreed that these claims would be dismissed without prejudice, on the understanding that they could be refiled should the complaint be reinstated. CSI moved for the district court to enter a final judgment dismissing its complaint. The court granted the motion, *Church of Scientology Int'l v. Time Warner, Inc.*, No. 92 Civ. 3024, 1999 WL 126450, at *2 (S.D.N.Y. Mar. 9, 1999), and this appeal followed.

## DISCUSSION

On appeal, CSI challenges the district court's rulings in *Time I* through *Time V* on the grounds that the district court (1) improperly ruled that portions of the Article's allegedly defamatory statements were not of and concerning CSI, (2) improperly disregarded CSI's evidence that the statements were made with purposeful avoidance of the truth, (3) committed plain error in dismissing the VSE statement under the subsidiary meaning doctrine, and (4) erred in refusing to permit CSI to pursue a claim for nominal damages premised on a finding of falsity. CSI has not appealed the district court's decision with respect to statements 11 and 12.

Libel, a method of defamation expressed in writing or print, is a common law cause of action and applies separate standards to plaintiffs who are private individuals and those who are public figures. *See Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir.2000). CSI concedes that it is a public figure; therefore to prevail it must show that the statements it complains of were (1) of and concerning CSI, (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice, that is, either knowledge of falsity or reckless disregard of the truth. *See id.* In contrast, a private plaintiff need only prove that false and defamatory statements of and concerning the plaintiff were made with gross negligence. *See Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 539, 435 N.Y.S.2d 556, 416 N.E.2d 557 (1980).

Of these inquiries, the first two should ordinarily be resolved at the pleading stage, while resolution of the falsity and actual malice inquiries typically requires discovery. In this case, we hold that CSI has failed to establish actual malice as to the statements identified in paragraphs 40, 45, and 58 of the Complaint, and as a result, CSI's claims based on the remaining statements, contained in paragraph 52, are barred by the subsidiary meaning doctrine. Accordingly, we do not reach the question whether any of these statements is "of and concerning" CSI.[1]

Under *New York Times*, a public figure plaintiff must prove that an allegedly libelous statement was made with actual

---

1. To the extent that the Behar Article uses the term "Scientology," Chief Judge Walker is of the view that the term as used denotes a belief system, or, as the Article puts it, a "cult," and that therefore references to "Scientology" are not "of and concerning" the plaintiff Church of Scientology International of Los Angeles, California. This is true as surely as invective directed generally at Catholicism cannot be considered defamatory of an individual Catholic or a particular parish church; such "group libels" are not actionable by discrete members of the group. *See National Nutritional Foods Ass'n v. Whelan*, 492 F.Supp. 374, 380 (S.D.N.Y.1980); *Brady v. Ottaway Newspapers, Inc.*, 84 A.D.2d 226, 445 N.Y.S.2d 786, 788–92 (1981). Chief Judge Walker also believes that the district court correctly concluded that the Article's references to individual Scientologists could not be "of and concerning" CSI. *See AIDS Counseling & Testing Ctrs. v. Group W. Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir.1990) (holding that "[a]llegations of defamation by an organization and its members are not interchangeable" (internal quotation marks omitted)).

malice, that is, made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280, 84 S.Ct. 710. This showing must be made by clear and convincing evidence. *See Celle*, 209 F.3d at 183. Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."). If it cannot be shown that the defendant knew that the statements were false, a plaintiff must demonstrate that the defendant made the statements with reckless disregard of whether they were true or false. The reckless conduct needed to show actual malice "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), but by whether there is sufficient evidence "to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," *id.*

The *St. Amant* Court found the following factors to be relevant to a showing that the defendant harbored actual malice: (1) whether a story is fabricated or is based wholly on an unverified, anonymous source, (2) whether the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation, or (3) whether there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. *See id.* at 732, 88 S.Ct. 1323.

■ CSI argues that Behar had a negative view of Scientology, and that his bias pervaded his investigation and caused him to publish false and defamatory statements about CSI. The district court found that the evidence could not support such a claim. The district court found that Behar's alleged bias would be relevant to show a purposeful avoidance of the truth if it were coupled with evidence of an extreme departure from standard investigative techniques. The district court concluded, however, that "plaintiff has failed to demonstrate the correlative circumstance of inadequate investigation to make its evidence of bias probative of actual malice, rather than probative of lack thereof," *Time II*, 903 F.Supp. at 641, noting also that the "speaker's belief in his statements, even his exaggerations, enhances, rather than diminishes, the likelihood that they are protected," *id.* We believe that the district court properly applied the actual malice standard, and turn to the statements themselves.

■ *The "Intimidation" Statements.* The district court found that Behar had relied on (1) "affidavits from former high-ranking Scientologists, newspaper and periodical articles, interviews and personal experience, and published court opinions" to support statement 1 (mafia-like intimidation), (2) the judgment of Cynthia Kisser, an executive director of an organization dedicated to the study of cults, which was likely to be given credence by Behar in view of her knowledge and experience, for statement 2 ("classically terroristic"), and (3) Behar's personal experience and research to support statement 3 (retaliation against journalists, lawyers, doctors and judges). *Id.* at 642–43. In view of the evidence in the record of Behar's extensive research, we agree with the district court's conclusion that no reasonable jury could find that defendants either knew or entertained serious doubts that these statements were false.

■ *The Fishman Statements.* The part of the Fishman statement that pertained to Fishman's stock scam (paragraph 45, statement 4) was not published with actual malice. Behar interviewed Steven Fishman, Robert Dondero, the Assistant

United States Attorney that prosecuted Fishman for stock fraud, and Marc Nurik, the attorney that represented Fishman. As the district court observed, Behar relied on these interviews. *See id.* at 644. He had no reason to have serious doubts about the truth of the information given him by the prosecuting attorney, the defense attorney, and the defendant in the case.

■ Nor were the murder-suicide allegations published with actual malice. Behar interviewed Fishman's psychiatrist, Uwe Geertz, and Vicki Aznaran, a former high-ranking Scientologist. CSI argues that Behar had evidence that Fishman's claims that the church had ordered him to kill Dr. Geertz and commit suicide were false since Fishman had previously tried to frame the church with similar charges by staging a phony death threat 18 months earlier. While this does raise questions about whether Fishman's account was reliable, the evidence in the record shows that Behar had considerable corroboration of Fishman's account, including the testimony of Dr. Geertz that he had reported the death threat referred to in the Article to the FBI, and Dr. Geertz's testimony in Fishman's criminal trial. In addition, Behar had reason to discount the relevance of the earlier threat based on his interview with Nurik, who told him that he believed Fishman had been manipulated into staging the fake death threat by Scientologists; Dr. Geertz's appraisal of the two threats; and Behar's own awareness of similarly convoluted plots to frame others. In any event, the Article does not present Fishman's claim as undisputed fact, but rather makes clear that Scientology denies the truth of Fishman and Dr. Geertz's charges. In view of the extensive research Behar conducted, and the fact that the death threat was accurately reported as an allegation, we agree with the district court that no reasonable jury could find that Behar had published the statements about the stock scam or the murder-suicide allegation with purposeful avoidance of the truth.

■ *The Lottick Statements.* The district court found that statements 8, 9, and 10 (concerning the Lotticks and the loss of their son Noah) could not be found to have been published with actual malice because the Lotticks were not obviously lacking in credibility, their statements were not inherently improbable, and Behar had investigated the case thoroughly. *See id.* at 643. We agree with the district court that CSI's complaints that Behar included some information and not other information, for example, by not interviewing Noah Lottick's roommate, amount to no more than "minor omissions in investigation, from which no inference of purposeful avoidance of the truth could reasonably be drawn," *id.* Any such omissions are insignificant when viewed against the backdrop of Behar's investigation as a whole: he interviewed Noah Lottick's parents, his friends and teachers, reviewed the police report of his death, and was twice refused an interview by the director of the Dianetics Center in Hackensack, New Jersey, that Noah was attending.

■ *The VSE Statements: Subsidiary Meaning.* The district court ultimately dismissed the VSE Statement based on the subsidiary meaning doctrine established by this court in *Herbert v. Lando*, 781 F.2d 298 (2d Cir.1986). *See Time III,* 932 F.Supp. at 595. In *Herbert,* we held that when a "published view" of a plaintiff is not actionable as libel, other statements made in the same publication are not "actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which it has been held that there can be no recovery." *Id.* at 312. Relying on the Supreme Court's holding in *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991), that the related "incremental harm" doctrine is not a creature of federal constitutional law, CSI argues that (1) the subsidiary meaning doctrine can be applied here only if it

is part of the relevant body of state law, and (2) neither California nor New York law, one of which presumably applies to this case, recognizes this doctrine. Because the subsidiary meaning doctrine is merely a gloss on constitutional actual malice, we disagree.

■ The incremental harm doctrine at issue in *Masson* reasons that when unchallenged or non-actionable parts of a publication are damaging, an additional statement, even if maliciously false, might be non-actionable because it causes no appreciable additional harm. *See Herbert*, 781 F.2d at 310; *Simmons Ford, Inc. v. Consumers Union*, 516 F.Supp. 742, 750 (S.D.N.Y.1981) (holding that, in the context of an article evaluating plaintiffs' new electrical car and rating it "Not Acceptable" for a range of unchallenged reasons, a portion of the article wrongly implying that the car did not meet federal safety standards "could not harm [plaintiffs'] reputations in any way beyond the harm already caused by the remainder of the article."). In *Masson*, the Supreme Court

> reject[ed] any suggestion that the incremental harm doctrine is compelled as a matter of First Amendment protection for speech ... [because t]he question of incremental harm does not bear upon whether a defendant has published a statement with knowledge of falsity or reckless disregard of whether it was false or not.

*Masson*, 501 U.S. at 523, 111 S.Ct. 2419.

■ By contrast with the incremental harm doctrine, the subsidiary meaning doctrine *does* "bear upon" whether a defendant has acted with actual malice. In *Herbert*, for example, this court held that nine of eleven allegedly libelous statements were not actionable because they were not maliciously published; the published statements were backed by evidence that was not known to be false, and as to the reliability of which the defendants had not shown reckless disregard. *See Herbert*, 781 F.2d at 305–07. Because the defendants' overall "view" of the plaintiff rested on such evidence, we held that they "could not be said to have had actual malice in publishing [it]." *Id.* at 311. In light of this conclusion, it would have been illogical to hold, based on other statements, that the plaintiffs in fact had such actual malice. *See id.* (holding that recovery was barred as to an "incorrect" statement in part because "given the amount of other evidence supporting this view, the [defendants] did not publish this view with actual malice"); *id.* at 312 (holding that recovery was barred as to another statement because "[w]e have already held ... that the [defendants] did not have actual malice in publishing their view"). To avoid that contradiction, we enunciated the subsidiary meaning doctrine. It follows that the doctrine, as articulated in *Herbert* and as relevant here, "bear[s] ... upon" whether a "view" was published with actual malice. It is thus a question of federal constitutional law, not state law, and it remains good law after *Masson*.[2]

Our holding in *Herbert* is still the law of this Circuit, and we therefore conclude that the district court properly held that the VSE Statement was subsidiary in meaning to the larger thrust of the Article, which asserted that "Scientology, rather than being a bona fide religion, is in fact organized for the purpose of making money by means legitimate and illegitimate." *Time III*, 932 F.Supp. at 595. We believe that the import of statements 6 and 7, which were included in the Article's VSE sidebar, is also subsidiary to the general

2. We also note that both the incremental harm and subsidiary meaning doctrines are distinct from the "libel-proof-plaintiff" doctrine. *See, e.g., Cardillo v. Doubleday & Co.*, 518 F.2d 638, 639 (2d Cir.1975) (dismissing action by convicted figure in organized crime who sued publisher for book that mentioned his involvement in criminal enterprises; holding that plaintiff was "libel-proof": "so unlikely by virtue of his life as a habitual criminal to be able to recover anything other than nominal damages."). Because that doctrine is not before us, we take no position on its continued vitality after *Masson*.

message of the Article, and therefore CSI's claims with respect to those statements were properly dismissed.

We have considered CSI's remaining arguments and find them to be without merit.[3]

## CONCLUSION

We find that the challenged statements in the Article were not published with actual malice or were subsidiary in meaning to statements made without actual malice. The judgments of the district court are affirmed, and the complaint is dismissed.

---

3. Among those other claims was CSI's claim for nominal damages. CSI's status as a public figure means that it was required to demonstrate actual malice, whatever remedy it sought.