**Paul JAMES, Plaintiff,**

v.

**Arthur DEGRANDIS, Mark J. DeGrandis, and Christopher Conklin, Defendants.**

**No. 97–CV–664C.**

United States District Court, W.D. New York.

March 30, 2001.

Jaeckle, Fleischmann & Mugel, LLP (Robert C. Weissflach, of Counsel), Buffalo, NY, for Plaintiff.

Hiscock & Barclay (Rodger P. Doyle, Jr., of Counsel), Buffalo, NY, for Defendants Arthur and Mark DeGrandis.

## *INTRODUCTION*

CURTIN, District Judge.

On August 27, 1997, plaintiff Paul James ("James"), a Canadian citizen and resident of Ontario, brought this diversity action against defendants Arthur DeGrandis ("Mr. DeGrandis") and Mark DeGrandis ("Mark"), residents of New Jersey, and Mary Kate Nugent ("Nugent") and Christopher Conklin ("Conklin"), residents of New York. Item 1. James, formerly a soccer coach at Niagara University ("Niagara") in Lewiston, New York, alleges that the defendants published defamatory statements about him which injured him in his business and occupation and damaged his reputation. He sought compensatory and punitive damages on his six causes of action. Defendant Christopher Conklin, pro se, answered on October 22, 1997, Item 5 and Defendants Arthur and Mark DeGrandis answered on October 29, 1997, Item 6. Defendant Mary Kate Nugent never answered, but settled with plaintiff. The settlement agreement was approved by court order on May 30, 2000. Item 41.

Discovery was completed; and on May 16, 2000, defendants Arthur and Mark DeGrandis submitted a Motion for Summary Judgment, for Attorneys' Fees, and for Sanctions with attached affidavits and exhibits, Item 36, accompanied by a Memorandum of Law, Item 37, Affidavit of Mark

J. DeGrandis, Item 38, Affidavit of Arthur DeGrandis, Item 39, and Statement of Facts, Item 40. On July 21, 2000, James submitted a Memorandum of Law in Opposition to the Motion for Summary Judgment, Item 45, a Memorandum of Law in Opposition to the Motion for Sanctions, Item 46, a Declaration/Affidavit by Paul James, Item 47, Affidavits by Robert C. Weissflach, Esq. opposing summary judgment, Item 48 and in opposition to sanctions, Item 49, Plaintiff's Counter–Statement of Disputed Material Facts, Item 50, and an Appendix of Exhibits, Item 51. On September 8, 2000, Rodger P. Doyle, Jr., counsel for Arthur and Mark DeGrandis, filed an affidavit in support of Defendants' Motion for Summary Judgment, Attorneys' Fees, and Sanctions. Item 54. Defendant Christopher Conklin did not submit any papers.

The court heard oral argument on the DeGrandis' Motion for Summary Judgment on October 27, 2000. Having considered the parties' arguments, the DeGrandises' Motion for Summary Judgment is granted in part and denied in part.

### BACKGROUND

Plaintiff Paul James is an accomplished soccer player. From 1982 to 1985, he played for the Toronto Blizzard, a professional team in the North American Soccer League. In 1987 and 1988, he played professionally for the Doncaster Rovers, a team in the English League. He also played professionally for four teams in the Canadian Soccer League. He was a member of the Canadian National Soccer Team from 1983 to 1993, and served as Captain in 1987. From 1987 to 1991, he was a League All–Star. As a member of the Canadian National Team, he participated in the 1984 Olympic games in Los Angeles and in the 1986 World Cup in Mexico City. Declaration of Paul James, Item 47, ¶¶ 5–

10. In 1989, James began his coaching career, and was named the Canadian Soccer League Coach of the Year in 1992. *Id.* ¶¶ 11, 12. Upon his retirement from the Canadian National Team, James decided to pursue a career in coaching, with a goal of becoming a soccer coach at a Division I college or university in the United States. He received a United States Soccer Federation ("USSF") "B" License and "A" License (the latter being the highest certification for soccer coaches in the United States). *Id.* ¶¶ 13, 14.

James also sought to establish his soccer camp business, the Soccer School of Excellence ("SSE"), which he served as President and Treasurer. SSE ran week-long residential soccer camps for young soccer players. Its goals were to develop player skills through providing high level practices and highly qualified coaching, and create scholarship opportunities for elite players. It also allowed James to evaluate talent and recruit for the college teams he might be coaching at the time. *Id.* ¶¶ 37, 38. SSE began operations as a Canadian corporation operating in Ontario. In August 1994, it incorporated in Delaware as Soccer School of Excellence U.S.A., Inc. The company's business plan had been to expand into the United States. *Id.* ¶ 39. College coaches often run soccer camps and clinics to supplement their income. *Id.* ¶ 40.

In 1993, the men's soccer coach at LeMoyne College ("LeMoyne") in Syracuse, New York, asked James to visit the school to perform demonstrations and clinics for the soccer players, which James did on a voluntary basis. LeMoyne's soccer coach left and recommended that James replace him. LeMoyne offered him the job as a part-time coach, to begin in August 1994. *Id.* ¶¶ 15, 18, 19.

## FACTS

Once he was offered the job as the LeMoyne men's soccer coach, Paul James began recruiting players for the team in February or March 1994. Item 51, Exh. 7, p. 97. He recruited from his home in Canada (Item 47, ¶ 21) on a voluntary basis and not as an employee of LeMoyne. Item 51, Exh. 9, ¶ 7. James was not employed by LeMoyne during the 1993–94 academic year. *Id.* ¶ 5. He was hired as head soccer coach at LeMoyne with a term commencing in August 1994 and running for two years. *Id.* ¶ 7.

James moved to Syracuse during the summer of 1994. He wrote articles on the World Cup for the Syracuse newspapers (Item 47, ¶ 26) and ran soccer camps at LeMoyne. Item 51, Exh. 7, p. 107. During that time, he met and began dating a LeMoyne College senior, Jeanne Dupree, a member of the basketball team. They had a romantic and sexual relationship. *Id.* pp. 106–07. Ms. Dupree was 21 years old at the time. Item 47, ¶ 21. When James was dating Dupree, he was not employed by LeMoyne and had not begun his coaching duties, which were to begin in August pursuant to his contract. *Id.* ¶ 27.

Before starting work as LeMoyne's soccer coach, James approached Richard W. Rockwell, the LeMoyne Athletic Director, and asked him what the school's view of his relationship with Ms. Dupree would be when he became a LeMoyne employee. Rockwell told him it would be a "black and white" issue and that he could not be employed by LeMoyne and date a student at the same time. Item 51, Exh. 9, ¶ 13. Rockwell advised James to think about what he wanted to do. *Id.* Exh. 7, p. 108. James decided to "meet the commitment of LeMoyne and to end the relationship." *Id.* He chose his career and business goals over his personal life. Item 47, ¶ 30. He

then became employed by LeMoyne College. Item 51, Exh. 10, ¶ 14.

After the 1995 season at LeMoyne, James was offered the opportunity to coach· at Niagara University, a Division I soccer program. Item 47, ¶ 32. He decided to take the Niagara position to further his coaching career, even though he could have stayed at LeMoyne because the school was willing to provide him with a contract extension. *Id.* ¶ 32; Item 51, Exh. 9, ¶ 16. Mr. Rockwell prepared a letter of recommendation for James. *Id.* Exh. 9, ¶ 17 and Exhibit A.

> Mr. Rockwell asserts that he was unaware of any allegations of sexual misconduct, sexual harassment or any other alleged inappropriate behavior by Paul James while he was employed by LeMoyne College. To my knowledge, Paul James did not engage in any sexual misconduct, sexual harassment or any other inappropriate behavior at any time before, during or after his employment at LeMoyne College. Paul James also did not violate any LeMoyne College rule or regulation at any time of which I am aware.

Item 51, Exh. 9, ¶ 15. James states "I was never accused of sexual misconduct, sexual harassment, or any other kind of inappropriate behavior (sexual or otherwise) while I was employed at LeMoyne College. I was not 'let go,' 'dismissed' or otherwise terminated from LeMoyne College for any reason." Item 47, ¶ 31.

James became the part-time Head Coach of Niagara's men's and women's soccer teams in January 1996. His first season began in the fall of 1996. *Id.* ¶ 34. James recruited Mark J. DeGrandis to play on the Niagara University soccer team (Item 40, ¶ 5), offering him a partial scholarship for the Fall 1996 season. Item 47, ¶ 46. When Mark reported to training camp, James found that Mark's and a

number of other players' physical fitness level was below what it needed to be to compete. Item 51, Exh. 8, p. 132. During the preseason, James had a conversation with Mark, who he perceived was unhappy. Mark's unhappiness stemmed from the fact that he was not always going to be on the first team. *Id.* Exh. 7, p. 138. James told him that he was potentially a good player, but physically he was behind and had to catch up. *Id.* Exh. 8, p. 130.

After the preseason games, Mark called his father and told him that James was harassing him. As examples of the harassment, Mr. DeGrandis related that when Mark would get the ball, James, from the sidelines, would say things like "Oh, come on, Mark" or tell him he was out of shape. *Id.* Exh. 3, pp. 20, 32. Mr. DeGrandis, a club soccer coach, viewed these comments as evidence of an improper coaching technique, designed to harass. *Id.* pp. 21, 24, 32.

Following a soccer tournament in Connecticut in early September 1996, James received a message to call Mr. DeGrandis, who expressed to him in

no uncertain terms, that he was very, very unhappy with the situation of Mark not playing. And then he criticized me as a coach .... [H]e told me that, in some areas, I didn't know what I was doing, that I was selective with players, that I was making Mark fail the way I was playing him, the position I was playing him, lots of other stuff. But, he was very, very angry and I was angry back.

*Id.* Exh. 7, pp. 145–46. Mr. DeGrandis demanded that James allow Mark to play 90 percent of the time, and criticized the performance of other players on the team at a game he had not attended. Item 47, ¶¶ 52, 54. During that telephone call, Mr. DeGrandis told James that he had problems with a previous coach of Mark's and that James would not get away with not

letting Mark play more. Mr. DeGrandis added that James would not "win this one," which James perceived as a threat. Item 47, ¶ 55.

Following the call from Mr. DeGrandis, James talked to Mark, and told him that he regarded Mark's using his father to raise the issue of playing time and his criticizing other players as disloyalty to the team. James told Mark that such concerns should be raised directly with the coach. Item 47, ¶ 56. James's experience was that successful teams handled disputes internally. *Id.*

After the James–Mr. DeGrandis telephone conversation, Mr. DeGrandis called both Mike Jankowski ("Jankowski"), Niagara's Athletic Director and Joe Cuda ("Cuda"), Dean of Student Affairs, telling them that Mark had been harassed and threatened by James, who was planning to kick him off the team in November. Item 51, Exh. 3, p. 45, 51. Mark met with Cuda for eight scheduled visits and several unscheduled visits between September and November. *Id.* pp. 52, 53. Cuda summarized the conversations as Mark venting his frustrations about James. He informed Mark that he could continue venting to him, but that would not lead to resolution since Cuda had no supervisory authority over athletic personnel. *Id.* Exh. 20. Mark informed his father about what transpired in the meetings with Cuda. *Id.* Exh. 4, p. 28. Mr. DeGrandis also spoke with Cuda several times about the harassment Mark was experiencing. *Id.* Exh. 3, pp. 53, 55–56.

On Parents Weekend in October, 1996, Mr. DeGrandis met with both Cuda and Rev. Vincent O'Malley, Niagara's Vice President. *Id.* Exh. 4, pp. 29, 30. Mark was aware that his father was attempting to talk to people within the Niagara administration about his problems with James. *Id.* p. 31.

In the fall of 1996, James considered cutting Mark from the team because of his disruption of the team and bad attitude. He eventually cut him in early November 1996 after Mark made a racial remark to a goalkeeper of the Howard University women's soccer team at a game he was watching. Item 47, ¶ 59.

After being cut, Mark discussed with his father filing a grievance against James regarding NCAA violations and harassment. Mr. DeGrandis told Mark he could type up the substance of the conversation and send it to him. Item 51, Exh. 3 pp. 62, 63, 65. The complaint, dated November 18, 1996, was addressed to the Department of Human Resources and charged James with "abusive power in his language ... [,] mental harassment, ... intimidati[on], ... retaliation and revenge, by dismissing me from the team ... [,] publicly slandering my name ... [,] violating player/coach confidentiality[,] violating NCAA recruiting rules and regulations and procedures." *Id.* Exh. 19. The complaint described James as a "negative force" at the University and urged the university to address the issue so as to maintain its "Vincentian heritage." *Id.*

On November 18, 1996, James arranged an end-of-the-year team banquet in Canada. He prepaid for the dinner, which included wine for students who had proper identification. The legal drinking age in Canada is 19. James did not intentionally purchase alcoholic beverages for students under 19 because he relied on the restaurant's statement that it would check identification. Item 47, ¶ 64. After the dinner, James drove Megan Daley, a student, home. Three other students were in the car. He gave Daley a kiss, although it was not a passionate or romantic kiss. *Id.* ¶ 66.

Mark was not present at the banquet. Item 51, Exh. 3, p. 84. On November 20,

Mr. DeGrandis called Cuda and told him that at the soccer party, minors were drinking alcohol with the coach present, and that James kissed a student on the dance floor. *Id.* Exh. 20. Mr. DeGrandis stated that James and Daley left the party together, and no one else left with them. *Id.* Exh. 3, p. 86. This call by Mr. DeGrandis served as a formal complaint about James' behavior, which prompted Cuda to launch an investigation into the incident, "to see if there was any validity to the information given." *Id.* Exh. 20. During an interview with Cuda, one student told him that there were rumors that the coach was kissing a freshman soccer player at the bar and that they went home together, and further that at a team meeting the next Monday, the coach explained that rumors should not be spread. *Id.* Over the next few days, Cuda met with additional students, including Megan Daley, the student who was allegedly kissed. She denied that anything happened, did not feel harassed or abused, and did not wish to pursue the matter in any way. Two other students said they witnessed a kiss, and five saw nothing. *Id.* James met with Cuda, upset at the way he was handling the investigation, particularly since he had heard that Cuda had asked one of his players whether James had slept with any students. *Id.*

The results of Cuda's investigation were conveyed by Jeannine Brown Miller, the Director of the Office of Human Resources, to the Chairman of the University Judicial Board. Ms. Miller found that there was no complaint of sexual harassment against James and, based on the investigation results, there was nothing to support the "third-party allegation" of improper behavior. *Id.*

On December 4, 1996, Mr. DeGrandis wrote Jankowski inquiring about the procedure James had used to remove Mark

from the team. Mr. DeGrandis expressed concern that "James issued a public diatribe slandering Mark at a team meeting" and that James "was causing disharmony on campus through his players." *Id.* Exh. 21.

In early 1997, Mark was reinstated to the soccer team by Jankowski on the basis that James had not documented the reasons for Mark's dismissal in November 1996, nor had he correctly followed the procedure for such dismissals. Item 47, ¶ 70. On January 31, 1997, Mr. DeGrandis wrote "Rev. Brian J. O'Connell," as President of Niagara University (even though the President at that time was Rev. Paul Golden). He related that James continues to "retaliate and seek revenge" against Mark, and recounted that "Tony Griffiths stated to several players that 'if Mark causes any trouble this year I'll break both his legs.'" Mr. DeGrandis continued, "This does not involve Tony. It comes from Paul James' perspective. So he retaliates by sending a player to do his bidding." Item 51, Exh. 22. He described an encounter between Mark and Tony, in which Mark asked Tony about the remark. In response, "Tony began to taunt and tantalize Mark" and had to be subdued so that he would not strike Mark. The letter ended by saying that "Paul James continues to perpetuate disharmony on campus; and Niagara is not a safe place for teaching and learning." *Id.* The letter was copied to a New Jersey law firm that Mr. De-Grandis never retained. *Id.* Exh. 3, p. 77.

On February 5, 1997, Mr. DeGrandis wrote another letter to "Rev. O'Connell," in which he stated that Mark had not yet received a response to his formal complaint against James submitted to the Office of Human Resources. Mr. DeGrandis was seeking a letter of apology from James "for all his transgressions along with a statement concerning Mark's play-

ing time." He cited his January 31, 1997 letter to O'Connell "explaining [James'] most recent dasterdly [sic] deeds are a good enough reason for all of the above." He concluded that James had been acting "with oppression and malice," and that the "University needs to correct this problem in any way possible." *Id.* Exh. 23.

In February or March 1997, Mark left a voice-mail message for James on his office telephone, in which he said he had "heard through the grapevine" that James was jobhunting, and inquired how he expected to get an interview "within the Federation" in view of "all of these letters and all the rest" in his file. Mark asked James to explain "what happened at LeMoyne, here at N.U., and what about around Williamsville and in the clubs where you do your camps?" Mark stated James "can't set his own terms," that he "put [him]self in a situation to be fired." *Id.* Exh. 35.

Asked where he received his information about James, Mark said he heard from Jankowski and members of the soccer team that James was job-hunting. *Id.* Exh. 4, p. 36. Students at Niagara and a LeMoyne student had told him that James left LeMoyne because of involvement with a student there. *Id.* p. 41. He never talked with anyone at LeMoyne to verify if that information was true. *Id.* p. 42.

Around the same time that Mark left James the voice-mail message, Mr. De-Grandis also left one. In it he said:

> You do not have an agreement anymore with Mike Yost and Dick Rockwell, I changed that. Your two-year contract was cut short because you were involved with a girl on the basketball team. You are *in trouble here for the same reasons and more.* Your personnel file is a disgrace to humanity. If Mark does not get a letter and a public apology, I am going to expose you for everything that you are and you will never coach again

in this country, and you can forget those camps in the summer. They will run you right out of town with your record and you are not going to use Mark's name as a reason to quit Niagara. If you are leaving it's because of all of the above. Its [sic] time you start owning up to your mistakes. You are not going to leave, change your address, lie about the past, just to do it over again somewhere else. Write the letter and publicly apologize or else your case will make the Canadian and American papers the same way other Canadian coaches are being exposed for what they are. I told you in September that you are in a no-win situation and you lost. Now you are in the lose-lose situation. Let's see if you're a fast learner.

*Id.* Exh. 35.

James sent both voice-mail messages to Jankowski, who described the "accusations and threats the elder DeG makes" as "astounding," particularly where Mr. DeGrandis likened James to the Canadian National men's hockey coach who was charged with abusing his players. *Id.* Exh. 24. Jankowski noted that James had been forward with him, and did not "have a clue regarding Williamsville or other camps that DeG speaks of." *Id.* After hearing the voice-mail messages, the Athletic Department determined that Mark should be removed from the soccer team. Item 47, ¶¶ 78, 79.

On March 19, 1997, Mr. DeGrandis again wrote "Rev. O'Connell" to inform him that Mark had been notified he was "off the team" because "he was disrespectful on Paul James' voice mail." He recounted how Niagara had let James publicly and privately humiliate Mark, and since Niagara has not corrected the problem, "I decided to take matters into my own hands." He requested copies of the voice-mail tapes, the names of those who heard

the tapes, and the names of those who decided to remove Mark from the team. He referred to Niagara as a "hostile and unsafe place" for Mark, who is "violently treated by the people who should have been helping him." He closed the letter by querying, "[A]m I correct in stating that it is easier to throw away 1 student, than chance public embarrassment of a coach who has a history of sexual misconduct." Item 51, Exh. 25.

Sometime before spring break 1997, Christopher Conklin, a Niagara student and former member of the Niagara soccer team, showed Mark a handwritten letter he said he had written concerning James. *Id.* Exh. 4, pp. 47–48; Exh. 26. Mark edited the letter and typed it up at his home in New Jersey. *Id.* Exh. 4, pp. 53, 93. Any differences between the handwritten letter and the typed letter dated April 2, 1997 occurred as a result of Mark's editing. *Id.* pp. 53, 56.

In his draft, Conklin had written, "To my knowledge Paul James was 'let go' per say [sic] from Lemoyne College for having intimate relations with a student athlete during the time he was employed by the university." Mark changed the text to "It is of course scandalous what he has done and continues to do each time he comes in contact with his players. It's common knowledge, our friends at LeMoyne tell us, that he was 'let go' at LeMoyne for sexual misconduct with an 18 year old student." *Id.* Exhs. 26 and 27.

In addition, the April 2, 1997 letter reads, "Ironically, the same behavior that had Mr. James dismissed from LeMoyne occurred at NU. This is also common knowledge as indicated by the students who observed and reported the incident to our administration." The letter referred to James screaming at a team meeting, observing that "These are not the actions of a stable adult who is paid to be respon-

sible for students. The university is aware of his abusive and harassing nature but they condone his actions ...." The letter ends by saying "Paul James should be dismissed for what he is and NU must practice what it preaches." *Id.* Exh. 27.

After typing the letter, Mark took it to Conklin, who signed it in his presence. *Id.* Exh. 4, p. 94. Mark then took the letter to Mary Kate Nugent, a Niagara student and former member of the women's soccer team, who signed it. *Id.* pp. 95–96. Nugent was told the letter was only going to the Athletic Department. *Id.* Exh. 5, p. 59.

Mark stated that he delivered copies of the letter only to the student government president and to the school newspaper. Item 38, ¶ 14. Nugent also stated that Mark told her that he gave the April 2 letter to different students around the campus such as TKE, a fraternity, and other people. Item 51, Exh. 5, pp. 57–58. Josh Meyers, a student at Niagara University and member of the soccer team, stated Mark told him that he was "going to send the letter he had written to coaches, administrators and camp directors in order to prevent Paul James from obtaining employment in the area." *Id.* Exh. 10, ¶ 6.

The April 2, 1997 letter had been sent to entities outside of Niagara University, including collegiate athletic departments, local elementary schools, and soccer federations, such as Niagara Falls School District, Dodge Elementary School (Williamsville, NY), New York State West Youth Soccer Association, various colleges in the Metro Atlantic Athletic Conference, the *Niagara Gazette* and *The Buffalo News.* Item 47, ¶ 85; Item 51, Exhs. 12, 13, 14, 15, 29.

Accompanying the April 2, 1997 letter distributed outside of Niagara University was an unsigned notice, addressed to "parents[,] coaches[, and] sports administrators" which stated that James was "banned from coaching soccer in Canada for sexual harassment"; that he was "fired for sexual misconduct involving an 18 year old student, and at Niagara University with an 18 year old player on his soccer team"; that he "[o]perates ... soccer camps in Lewiston, Williamsville and Buffalo areas" and that "[a]fter he is hired and on contract he looks for young girls and camp counselors." It ended with "[m]ake sure you chaperone your kids at all times." Item 51, Exh. 28. The envelopes containing the April 2, 1997 letter and the notice were postmarked Buffalo. Mail from Niagara is postmarked from Buffalo. *Id.* Exh. 29; Item 47, ¶ 89.

On April 28, 1997, the acting captain of the Niagara Men's Soccer Team, John Parsons, wrote a letter signed by 32 of 36 members of the 1996 season soccer team in response to the April 2, 1997 letter. Item 51, Exh. 11. Parsons expressed the "unbounded respect and admiration in which we hold our coach," sentiments that were much different from the "ludicrous picture" painted by the April 2 letter, where a team meeting was used "to represent Paul James as some sort of tyrant whóm the players are in fear of." The majority of players left that meeting "feeling inspired and looking forward to the upcoming season." Parsons termed the charges of sexual misconduct as "scandalous" and "so far wrong that they hardly deserve comment." He focused instead on the:

> hard work, dedication, and success which Paul James has brought to the Niagara Soccer Program. The relationship between the vast majority of the soccer players at Niagara and Paul James is one of mutual respect and admiration on our part. There is nobody we would rather play for than Paul James.

*Id.*

Several people from New York State and Canada mentioned to James that they

had received the letters, including the father of a Niagara student, an assistant coach at the University of Buffalo, a former player with the Canadian National Team, a Dean at Syracuse University, and people from Queens University in Ontario and from Fairfield University. Item 47, ¶ 90. Having to discuss these accusations was embarrassing and distressful to James. *Id.* ¶ 91. In August 1997, Jankowski prepared a statement for distribution to any entities that inquired about the allegations in the letters, noting that the accusations had no basis. Item 51, Exh. 32.

On July 5, 1997, Mr. DeGrandis wrote the Association of Catholic Colleges and Universities recounting the history of his son's complaints regarding James and Niagara's handling of the situation. *Id.* Exh. 30. In the letter, he referred to James in the context of "an unauthorized team party, fraternizing with 18 yr. old students, and issues centering around sexual misconduct." Mr. DeGrandis asserted that the Dean confirmed the allegations of sexual misconduct. *Id.* The ACCU responded that it was not an investigative agency. *Id.* Exh. 31.

James filed a defamation suit on August 27, 1997 against Arthur and Mark DeGrandis, Conklin, and Nugent. James realized that his ability to continue coaching at Niagara had been "irreparably damaged" by the defendants' actions. He felt compelled to leave Niagara for his own well-being and that of the Niagara teams, and resigned his position. Item 47, ¶ 94. He began to look for a new job in November and December 1997. Item 51, Exh. 8, p. 77.

James was unemployed for four months before he found another job, as coach of the Canadian National Under–20 Soccer Team. Item 47, ¶¶ 98, 99.

Mary Kay Nugent is no longer a defendant because she has settled with a letter of apology and $3,000.

## ARGUMENT

### I. Legal Standard for Summary Judgment

Summary judgment is appropriate where "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999). A genuine issue of material fact is present if the fact will "affect the outcome of the suit under the governing law" and the supporting evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In evaluating a summary judgment motion, "the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505; *Sutera v. Schering Corp.,* 73 F.3d 13, 15 (2d Cir.1995). "In making its determination, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Sorlucco v. New York City Police Department,* 888 F.2d 4, 6 (2d Cir.1989).

The party seeking summary judgment "[a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a gen-

uine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Gallo v. Prudential Residential Services*, 22 F.3d 1219 (2d Cir.1994). Where the nonmoving party bears the ultimate burden of proof at trial, the motion may not be rebutted by restating allegations in the pleadings or statements in the party's own affidavit. Rather, the nonmoving party must "[d]esignate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed. R.Civ.P. 56(e)). "The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995) (citations omitted).

## II. Causes of Action

James's complaint alleges six causes of action: (1) the first alleges that Mr. De-Grandis stated that Paul James had slept with an 18–year–old freshman, which was published to Niagara University Dean of Student Affairs Joe Cuda; (2) the second alleges that Mark stated to other soccer players and members of the Niagara community that James told other soccer players to break Mark's legs in practice, and that Mr. DeGrandis aided and abetted this defamatory statement; (3) the third, against Mr. DeGrandis, concerns his statement in a March 19, 1997 letter to the President of Niagara University referring to James's "history of sexual misconduct;" (4) the fourth, against all defendants, concerns the April 2, 1997 letter signed by Conklin and Nugent containing defamatory language, including the statement that James was dismissed from LeMoyne for sexual misconduct and that he has an abusive and harassing nature; (5) the fifth, against Arthur and Mark DeGrandis, for publishing the anonymous letter that accompanied the April 2, 1997 letter to soc-

cer-related entities throughout the northeastern United States and Canada; (6) the sixth, against all defendants, alleging that the defamatory statements had been made intentionally, constitute extreme and outrageous conduct exceeding all bounds usually tolerated by decent society (intentional infliction of emotional distress).

## III. First Cause of Action

The first cause of action, against defendant Arthur DeGrandis, alleges that Mr. DeGrandis stated to the Dean of Student Affairs at Niagara University, Joseph Cuda, that Paul James had "slept with an 18–year–old freshman, thus making him guilty of sexual misconduct...." Item 1, ¶ 39. James charges that this defamatory statement is false, injures him in his business and occupation, and damages his reputation. He further charges that the statement was made with malice, both constitutional (knowledge of its falsity and/or with reckless disregard for its truth) and common law (ill will and spite).

█ Because James has not adduced any specific facts to show this statement was actually made, Mr. DeGrandis is entitled to summary judgment on this cause of action. Mr. DeGrandis, in his deposition, admits that he telephoned Cuda on November 20, 1996 and told him that, at a soccer party, "I know that Paul was kissing Megan at the party. I know that he left the party with her." Item 51, Exh. 3, p. 84. He added that "we also heard that Megan did not go back to Canada that night" and "No one else left with Paul, just Megan and Paul." *Id.* pp. 85, 86. He denied that he ever accused James of "sleeping with" an 18–year–old freshman. Item 39, ¶ 5.

Joe Cuda, in his memorandum concerning his investigation into the 'incident' at the soccer party, notes that Mr. DeGrandis

told him that "students were commenting on Soccer Coach Paul James kissing a female student-athlete on the dance floor." The memo cites another student to whom Cuda talked, stating that "people were saying that they went home together." Joe Cuda's affidavit is missing from plaintiff's exhibits (Item 51, Exh. 16) in opposition to the Motion for Summary Judgment. James, in his declaration (Item 47, ¶ 62), is the only person who states that Mr. DeGrandis called Cuda, alleging that James had slept with a female soccer player after that dinner. Because plaintiff has not supported this allegation with any evidence to create a genuine issue of material fact, summary judgment on this cause of action is granted to defendant Arthur DeGrandis.

## IV. Second Cause of Action

This cause of action suffers from the same problems that beset the first cause of action. Plaintiff alleges that Mark stated that James "had told other soccer players to break his legs in practice," the statement was "published to other soccer players and members of the Niagara University community," (Item 1, ¶ 46) and that Mr. DeGrandis conspired in, participated in, aided, abetted, and otherwise encouraged the publication of this defamatory statement.

The only reference to a statement similar to what was pled is found in Item 51, Exhibit 22, a letter from Mr. DeGrandis to the President of Niagara University. Mr. DeGrandis wrote that a Tony Griffiths stated to several players that " 'if Mark causes any trouble this year I'll break both his legs.' " Mr. DeGrandis considered that Tony was not the originator of the remark; rather, "[i]t comes from Paul James' perspective. So he retaliates by sending a

player to do his bidding."[1] The letter then relates an encounter where Mark asked Tony about the remark, and Tony apparently became obstreperous and had to be subdued. Item 51, Exh. 22.

▮ Nowhere in plaintiff's exhibits is there a reference that Mark made the statement alleged, nor is there any evidence that Mr. DeGrandis had any role in Mark's making the statement. In his affidavit, Mark states that he told his friends at Niagara that "a fellow student had threatened to break my legs if I rejoined the soccer team," but this statement doesn't allege that James told the player to threaten Mark. Item 38, ¶ 18. Therefore, because plaintiff has not provided any evidence that this statement was made, summary judgment on this cause of action is granted to defendants Arthur and Mark DeGrandis.

## V. Third Cause of Action

The third cause of action against Arthur DeGrandis concerns a statement in a letter he wrote to the President of Niagara University, dated March 19, 1997, which refers to Paul James's "history of sexual misconduct." Item 1, ¶ 54. James charges that this defamatory statement is false, injures him in his business and occupation, and damages his reputation. He further charges that the statement was made with malice, both under constitutional and common law standards. In his defense, Mr. DeGrandis asserts the defenses of truth, qualified privilege, and the doctrines of the libel-proof plaintiff and subsidiary meaning.

### A. Defamation—In General

▮ In a defamation claim, the plaintiff must establish under New York's sub-

---

1. While this might possibly be considered a defamatory statement by Mr. DeGrandis, it

was not pled in the complaint.

stantive law that there was a defamatory statement of fact regarding him, published to a third party by the defendant, and resultant injury to the plaintiff. *Vinson v. Bryant and Stratton Business Institute, Inc.,* 1995 WL 307594 at *9 (W.D.N.Y. May 15, 1995). Defamation claims "provide redress for injuries to a person's reputation caused by statements that 'tend[ ] to expose [him] to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community.'" *Levin v. McPhee,* 119 F.3d 189, 195 (2d Cir.1997) (quoting *Tracy v. Newsday, Inc.,* 5.N.Y.2d 134, 135, 182 N.Y.S.2d 1, 155 N.E.2d 853 (1959)). Under New York law, it is for the court to decide whether a statement, in the context of the overall publication or broadcast, is reasonably susceptible to a defamatory meaning. *Id. See Corporate Training Unlimited, Inc. v. National Broadcasting Co.,* 981 F.Supp. 112 (E.D.N.Y.1997). Applying New York law to the facts before the court, the statement was defamatory. *See Golub v. Enquirer/Star Group,* 89 N.Y.2d 1074, 659 N.Y.S.2d 836, 837, 681 N.E.2d 1282 (1997); *Rejent v. Liberation Publications, Inc.,* 197 A.D.2d 240, 611 N.Y.S.2d 866, 869 (1st Dept.1994).

### B. Truth

■ Proof of the truth of defamatory words constitutes a complete and absolute defense to an action for libel or slander, regardless of the harm done by the statement and regardless of the malicious or evil motives that may have prompted its publication. *43A NYJur2d,* Defamation and Privacy, § 98; *Han v. State,* 186 A.D.2d 536, 588 N.Y.S.2d 358, 360 (2d Dept.1992). A court will properly deny defendants' motion for summary judgment in a defamation action if "[d]efendants failed to establish sufficiently their defense that the statements … were true to warrant the court as a matter of law to direct

judgment in their favor." *Dec v. Auburn Enlarged School District,* 249 A.D.2d 907, 672 N.Y.S.2d 591, 593 (4th Dept.1998) (citations omitted). In this case, there is nothing to support Mr. DeGrandis's argument that the statement was true. Substantial evidence has been presented to show the falsity of the statement, and summary judgment must be defeated on this ground.

### C. Qualified Privilege

■ Even though a statement is defamatory, "there exists a qualified privilege where the communication is made to persons who have some common interest in the subject matter." *Foster v. Churchill,* 87 N.Y.2d 744, 642 N.Y.S.2d 583, 587, 665 N.E.2d 153 (1996), citing *Liberman v. Gelstein,* 80 N.Y.2d 429, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992). The common-interest privilege arises "when a person makes a good-faith, bona fide communication upon a subject in which he or she has an interest, or a legal, moral, or societal interest to speak, and the communication is made to a person with a corresponding interest." *Hoyt v. Kaplan,* 263 A.D.2d 918, 694 N.Y.S.2d 227, 229 (3d Dept.1999) (citations and quotation omitted). The relation of the parties "should be such as to afford reasonable ground for supposing an innocent motive for giving the information, and to deprive the act of an appearance of officious intermeddling with the affairs of others." *Garson v. Hendlin,* 141 A.D.2d 55, 532 N.Y.S.2d 776, 780 (2d Dept.1988) (citations and quotation omitted). The "decision as to whether, under the circumstances, a privilege exists, is for the court and not the jury." *Stewart v. Florence Nightingale Health Center/Carnegie Partners, Inc.,* 1999 WL 179373 (S.D.N.Y. March 31, 1999) (citations omitted).

■ However, qualified privilege has its limits. An abuse of the privilege can be

shown by proving that the defendant acted outside the scope of the privilege such as by excessive publication; *see Stukuls v. New York*, 42 N.Y.2d 272, 397 N.Y.S.2d 740, 746, 366 N.E.2d 829 (1977). In addition, "the shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with 'malice.'" *Liberman*, 590 N.Y.S.2d at 862, 605 N.E.2d 344 (citation omitted).

 A letter to the President of a University by a concerned father regarding the treatment of his student son by a coach-employee of the University, which had a wider application to the Niagara University community, would appear to satisfy the requirements for assertion of a qualified privilege. However, a question of material fact arises as to whether Mr. DeGrandis abused the qualified privilege by speaking with malice or by acting outside the scope of the privilege, and Mr. DeGrandis cannot avoid responsibility by relying on these exceptions.

Plaintiff has provided ample evidence of malice [2] on the part of Mr. DeGrandis to counter the qualified privilege defense. For example, in February 1997, a month prior to his writing the March 19, 1997 letter, Mr. DeGrandis left a voice-mail on Paul James's telephone. Item 51, Exh. 35. The text is fully set forth in the Facts, *supra* p. 12. Against that background, a rational fact-finder could find that Mr. De-Grandis was not referring to James's "history of sexual misconduct" simply to protect the students at Niagara University from a sexual predator, but that he was only seeking to get his son back on the team, that he regarded James as an impediment to that goal, and that he wanted to get James fired and would use any means necessary to injure him. In this case, the question of malice should be left for the jury.

A rational fact-finder could conclude that Mr. DeGrandis's communication to the university was made with malicious intent [3] and not for the purpose of helping the authorities come to a reasoned decision. Further, the widespread publishing of the statement goes far beyond the limits of qualified privilege.

## D. Libel–Proof Plaintiff

 The libel–proof plaintiff doctrine "reasons that when a particular plaintiff's reputation for a particular trait is sufficiently bad, further statements regarding that trait, even if false and made with malice, are not actionable because, as a matter of law, the plaintiff cannot be damaged in his reputation as to that trait." *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F.Supp. 589, 593 (S.D.N.Y. 1996). This concept was explored in *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298 (2d Cir.1986), wherein the court held that plaintiff's longstanding reputation for adultery rendered him libel-proof concerning allegations of adultery, even though the allegations related to a time period when plaintiff was no longer married and thus was no longer committing adultery. In the same vein, "if there is little or no harm to a plaintiff's already low reputation, then the statements are not action-

---

**2.** There are two types of malice: common law malice and constitutional (or actual) malice. Common law malice is defined as "spite or ill will." *Liberman*, 590 N.Y.S.2d at 862, 605 N.E.2d 344. Actual malice, under *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is found if the defendant had made the statement with

"knowledge that [the statement] was false or ... with reckless disregard of whether it was false or not."

**3.** The evidence is substantial enough to conclude that Mr. DeGrandis demonstrated common law malice, if not constitutional malice as well.

able." *Cerasani v. Sony Corp.*, 991 F.Supp. 343, 352 (S.D.N.Y.1998) (citation omitted). However, the Second Circuit has warned that "[t]he libel-proof plaintiff doctrine is to be applied with caution, since few plaintiffs will have so bad a reputation that they are not entitled to obtain redress for defamatory statements . . . ." *Cerasani*, 991 F.Supp. at 352, quoting *Guccione*, 800 F.2d at 303 and citing other cases therein. As *Church of Scientology* found, dismissal based on the libel-proof plaintiff doctrine was not appropriate at the summary judgment stage because it required the court to make "factual findings regarding plaintiff's reputation for a particular trait." 932 F.Supp. at 594. There is nothing in the plaintiff's background or from the facts which have been developed here to support an argument that plaintiff had such an evil reputation that he could be considered libel-proof. The extensive evidence proffered by plaintiff counters this defense offered by Mr. DeGrandis.

### E. Subsidiary Meaning Doctrine

■ The subsidiary meaning doctrine holds that "where a maliciously false statement implies the same ultimate conclusion as that of the remainder of the publication, which has been published without actual malice, a plaintiff cannot 'base his defamation action solely on inaccuracies contained within statements subsidiary to these larger views.'" *Church of Scientology*, 932 F.Supp. at 594, quoting *Herbert v. Lando*, 781 F.2d 298, 311 (2d Cir.1986). "Having determined one or more ultimate conclusions of the publication, and determined that those conclusions were not published with actual malice, a court must grant summary judgment for the defendant where the minor inaccuracies sued upon are subsidiary to one of the larger views which is nonactionable." *Church of Scientology*, 932 F.Supp. at 594.

Without doubt, the subsidiary meaning doctrine does not apply to the facts of this case.

In conclusion, defendant's motion for summary judgment on the third cause of action is denied.

### VI. Fourth Cause of Action

The fourth cause of action concerns the publication of the April 2, 1997 letter, signed by defendants Christopher Conklin and Mary Kay Nugent. Defendant Mark DeGrandis stated that Conklin gave him a handwritten letter (Item 51, Exh. 26) and admits that he edited and typed the letter at his home in New Jersey during spring break, changing some of the wording. Item 51, Exh. 4, pp. 53, 56, 93. Mark brought the letter to Conklin and Nugent for them to sign. *Id.* pp. 94–96. He also admits delivering a copy of the letter to the Student Government President and the Niagara University newspaper. Item 38, ¶ 14. Concerning the actual authorship of the letter, Mary Kay Nugent testified that Mark told her "he pretty much told Chris what to write" in the letter. Item 51, Exh. 5, p. 39

Regarding distribution of the April 2, 1997 letter, Niagara student Josh Meyers stated in his affidavit that Mark "told me that he was going to send the letter he had written to coaches, administrators and camp directors . . . ." *Id.* Exh. 10, ¶ 6.

Mr. DeGrandis denied that he had anything to do with the preparation and publishing of the April 2 letter. *Id.* Exh. 3, p. 117. The evidence offered by plaintiff linking him with the letter is circumstantial. Mr. DeGrandis stated that he knew Mark prepared it on his typewriter at their New Jersey home, but claims he was not there at the time. *Id.* pp. 117–18. He did know, however, that it was going to "go out," and that Mark did not sign it because the DeGrandises were "in the pro-

cess of our own law suit and Mark didn't want to get involved and I didn't want to get involved in anything." *Id.* p. 119.

The April 2 letter appeared after Mr. DeGrandis wrote in his March 19, 1997 letter that he had "decided to take matters into [his] own hands" concerning James, and his "history of sexual misconduct." *Id.* Exh. 25. He admitted that the letter's reference to James's being "let go" at Le-Moyne because of sexual misconduct with an 18–year–old student pertained to similar matters conveyed in the voice-mail taped message. *Id.* Exh. 3, p. 118. The April 2 letter is addressed to Rev. Brian O'Connell, who had not been President of Niagara for over a year at that time; this mistake had been made *only* by Mr. De-Grandis in his letters of January 31, 1997, February 5, 1997 and March 19, 1997 to O'Connell as President of Niagara. *Id.* Exhs. 22, 23, 25. The April 2, 1997 letter is stylistically similar to Mr. DeGrandis's prior letters, with the placement of the date in the upper right hand corner and similar handwritten corrections of misspelled words and spacing errors. Mr. DeGrandis admitted that he typed Mark's complaint to the Office of Human Resources, yet another instance of his involvement in his son's career as a Niagara soccer player during that school year. *Id.* Exh. 3, p. 121. Mark confirmed that he and his father were working in conjunction trying to resolve the situation with Paul James. *Id.* Exh. 4, p. 33.

■ Given this circumstantial evidence, and resolving all inferences in favor of the non-moving party, a question of material fact exists concerning Mr. DeGrandis's role in composing the April 2, 1997 letter. A question of material fact also exists as to his knowledge that there was a great likelihood of subsequent publication of the letter, which forms a sufficient basis for liability. *Pirre v. Printing Developments,*

*Inc.,* 468 F.Supp. 1028, 1041 n. 14 (S.D.N.Y.1979).

## A. The Incremental Harm Doctrine

■ As a defense, defendants assert the incremental harm doctrine, which reasons that "when unchallenged or nonactionable parts of a particular publication are damaging, another statement, though maliciously false, might be nonactionable on the grounds that it causes no harm beyond the harm caused by the remainder of the publication." *Church of Scientology,* 932 F.Supp. at 593 (citations omitted). The incremental harm doctrine "measures the difference between the harm caused by non-actionable statements when compared with the harm caused by purportedly actionable statements and dismisses the latter when the difference is incremental." *Jewell v. NYP Holdings, Inc.,* 23 F.Supp.2d 348, 387 (S.D.N.Y.1998).

■ In this cause of action, it would be a question of fact as to whether the statement that James was 'let go' at LeMoyne for 'sexual misconduct' caused only incremental harm when compared with statements in the remainder of the letter that focused on James's other perceived debits as a coach. This defense is unavailing.

## B. Rumor

The defendants characterize the statement in the letter: "It's common knowledge, our friends at LeMoyne tell us, that he was 'let go' at LeMoyne for sexual misconduct with an eighteen-year old student" as rumor, and an uncertain rumor at that. Item 38, ¶ 11.

Rumor is defined as " 'a flying or popular report,—the common talk * * * not the remarks of a single person.' " *Stukuls,* 397 N.Y.S.2d at 746, n. 6, 366 N.E.2d 829, quoting *Smith v. Moore,* 74 Vt. 81, 86, 52 A. 320. Mark's defense is that the

assertion is presented as rumor rather than fact.

 Rumor as a defense to defeat this cause of action is unavailing. *See Alianza Dominicana Inc. v. Fermin Luna,* 229 A.D.2d 328, 645 N.Y.S.2d 28, 30 (1st Dept. 1996) ("[N]otwithstanding the cautionary language used by [the defendant], such as 'they say' or 'rumor in the streets say', these particular statements are actionable," finding that a reasonable person would have understood the statements as "'assertions of provable fact.'"); *Flamm v. American Association of University Women,* 201 F.3d 144, 152 (2d Cir.2000) (citations omitted) ("the fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character.") It is possible that reasonable persons could find that the use of the quoted term "let go" in the April 2 letter did not convey an element of uncertainty or ambiguity: it meant that James was fired because of sexual impropriety based on facts that could be readily ascertained and about which the source knew. The later use of the phrase "common knowledge" when describing certain Niagara students' awareness of James's alleged sexual improprieties could be interpreted by a reasonable fact-finder that the writers of the letter were conveying ascertainable facts.

Therefore, rumor as a defense to defeat summary judgment on this cause of action is also unavailing.

### C. Qualified Privilege

 Defendants may not find refuge in the defense of qualified privilege as to this cause of action. There is sufficient evidence of both malice and excessive publication to defeat this defense. As indicated above, qualified privilege can be defeated by both malice and excessive publication. Mark's voice-mail message to James (Item 51, Exh. 35) could be interpreted by a rational fact-finder as evidence of his malice toward James. His editing of Conklin's handwritten letter to make James's alleged sexual misconduct appear more scandalous could also be viewed as evidence of his malice. In addition, the question of excessive publication arises here, since the April 2 letter was sent throughout the Northeastern United States and to Canada. Although Mark avers he only published the letter to the head of the student government and *Niagara Index,* Nugent states that he told her he gave it to the TKE fraternity and others on campus (*Id.* Exh. 5, pp. 57–58), and Josh Meyers states Mark told him he intended to send the letter to coaches, administrators, and camp directors (*Id.* Exh. 10, ¶ 6), where in fact it was sent. Because there is an issue of material fact concerning Mark's involvement in sending the letter beyond the Niagara community, which may defeat the defense of qualified privilege, this defense is unavailing.

In conclusion, defendants' motion for summary judgment is denied on this cause of action.

### VII. Fifth Cause of Action

When the April 2, 1997 letter was sent to soccer-related entities throughout New York and Canada, an anonymous notice was included in the same envelope. *Id.* Exh. 28. Both Mark and Mr. DeGrandis deny that they prepared, published, or disseminated the notice. Item 38, ¶ 15; Item 39, ¶ 10. The notice was addressed to parents, coaches, and sports administrators and contained assertions that James was "fired for sexual misconduct involving an 18 year old student, and at Niagara University with an 18 year old player on his soccer team." It refers to James's

holding "soccer camps in Lewiston, Williamsville and Buffalo areas." Item 51, Exh. 28.

▋ As indicated *supra*, Mark planned to send the April 2, 1997 letter to coaches, administrators, and camp directors in an effort to prevent James from obtaining employment in the area. Mr. DeGrandis had asserted in the voice-mail that James ran soccer camps in Williamsville. Mr. DeGrandis also had vowed that James could "forget those camps again in the summer," that he would expose James in the same way that other Canadian coaches were being exposed, and that his case would make the American and Canadian papers. *Id.* Exh. 35. Mark and Mr. De-Grandis worked closely to remove James from his post. This effort included working together on the letter-complaint to Niagara's Department of Human Services. Mark also admitted involvement in the April 2 letter. Therefore, resolving all inferences in favor of the non-moving party, it is reasonable that Mark and Mr. DeGrandis were involved in composing and sending the anonymous letter out in the same envelope as the April 2 letter. On that basis, summary judgment in favor of Mark and Mr. DeGrandis is denied on this cause of action.

## VIII. Sixth Cause of Action

This cause of action charges that the defamatory statements made by all defendants constituted intentional infliction of emotional distress.

▋ Under New York Law, the tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) causal connection between the conduct and the injury; and (4) severe emotional distress. *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699

(1993). *See Nunez v. A–T Financial Information, Inc.*, 957 F.Supp. 438 (S.D.N.Y. 1997). Courts have relied on the outrageousness element to set reasonable bounds on this potentially limitless tort and have required that plaintiff allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983).

▋ In *Foley v. Mobil Chemical Co.*, 214 A.D.2d 1003, 626 N.Y.S.2d 906 (4th Dept.1995), the court found that although sexual harassment allegedly committed by the defendants represented wholly inappropriate behavior, it was not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress. *Id.* at 908. Even a false charge of sexual harassment does not rise to the level of outrage required to recover on an intentional infliction of emotional distress claim under New York law. *Herlihy v. The Metropolitan Museum of Art*, 214 A.D.2d 250, 633 N.Y.S.2d 106, 114 (1st Dept.1995).

Because the bar is so high for a plaintiff to successfully plead facts sufficient to comprise intentional infliction of emotional distress, and plaintiff has not overcome that legal barrier, summary judgment in favor of defendants Arthur and Mark De-Grandis is granted on the sixth cause of action.

## IX. Damages

Defendants DeGrandis proffer the additional argument that (1) plaintiff has not suffered any damages, which require dismissal of his claims, and alternatively, (2) if damages are found, they are insufficient to confer jurisdiction in federal court. De-

fendants provide no support in case law for these assertions.

Plaintiff counters that the damages amount claimed in the complaint is controlling if the claim is "apparently made in good faith:" the case can be dismissed only if it appears "to a legal certainty that the claim is really for less than the jurisdictional amount . . . ." *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

■ The complaint alleges damages of $500,000 on each of the six claims. These allegations of damages exceed the $75,000 jurisdictional amount required for diversity actions. This confers subject matter jurisdiction.

■ While plaintiff alleges economic damages below the jurisdictional minimum, his defamation claims seek compensatory damages for loss of reputation and humiliation, which could well exceed the jurisdictional minimum. "These allegations sufficiently claim actual injuries, and though they must be proved at trial, they need not be supported by affidavit proof on this summary judgment motion." *Hogan v. Herald Company,* 84 A.D.2d 470, 446 N.Y.S.2d 836, 843 (4th Dept.1982). Where tort damages are concerned, any doubt about the question of recovery must be resolved in favor of jurisdiction. *Deutsch v. Hewes St. Realty Corp.,* 359 F.2d 96, 101 (2d Cir.1966). Defendants are denied summary judgment pursuant to this defense.

## X. Sanctions

Defendants have not complied with Rule 11, requiring a motion for sanctions to be made separately from other motions or requests. In addition, because some of the causes of action do not lack support, are not frivolous, and survive a motion for summary judgment the court denies defendants' motion for sanctions. *See O'Brien v. Alexander,* 101 F.3d 1479, 1489 (2d Cir. 1996).

### CONCLUSION

For the reasons stated above, defendants Arthur DeGrandis and Mark DeGrandis' motion for summary judgment is granted on Counts One, Two, and Six, and denied on counts Three, Four and Five.

So ordered.