**Claudia DiFOLCO, Plaintiff,**

v.

**MSNBC CABLE L.L.C., Rick Kaplan, and Scott Leon, Defendants.**

**No. 06 Civ. 4728 (LAP).**

United States District Court, S.D. New York.

Nov. 9, 2011.

James Ryan Hubbard, Liddle & Robinson, LLP, Kenneth P. Thompson, Lawrence Michael Pearson, Thompson Wigdor & Gilly LLP, New York, NY, for Plaintiff.

Hilary Lane, Julie Rikelman, NBC Universal, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

LORETTA A. PRESKA, Chief Judge:

Plaintiff Claudia DiFolco ("Ms. DiFolco" or "Plaintiff"), a former correspondent, reporter, and television host for MSNBC Cable L.L.C. ("MSNBC"), filed a complaint against defendants MSNBC, MSNBC's former President Rick Kaplan ("Mr. Kaplan"), and former MSNBC Executive Producer Scott Leon ("Mr. Leon") (collectively, "Defendants"), alleging that Defendants breached an employment agreement between Plaintiff and MSNBC. Plaintiff also alleges that Defendants were responsible for publishing three alleged defamatory statements concerning Plaintiff posted on three separate websites between August 31, 2005 and September 4, 2005. Defendants contend that Plaintiff repudiated the employment agreement and that they were not responsible for making or publishing the alleged defamatory statements. Defendants now move for summary judgment as to Plaintiff's breach of contract and defamation claims pursuant to Federal Rule of Civil Procedure 56. For the following reasons, Defendants' motion for summary judgment [dkt. no. 71] is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

The following facts are not in dispute.[1] On December 2, 2004, Plaintiff entered

---

1. These following facts are taken from: Defendants' Rule 56.1 Statement ("Def. 56.1"); Plaintiff's Response to Defendants' Rule 56.1 Statement of Material Facts ("Pl. 56.1"); Defendants' Response to Plaintiff's Additional Material Issues of Fact ("Def. Reply 56.1"); Declaration of Julie Rikelman in Support of Defendants' Motion for Summary Judgment ("Rikelman Decl."); Declaration of Lawrence M. Pearson in Support of Plaintiff Claudia

into a two-year employment contract (the "Contract") with MSNBC, covering the time period from January 2005 to January 2007. (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.) MSNBC hired Plaintiff primarily to be the Los Angeles-based correspondent for two shows, "MSNBC at the Movies" and "MSNBC Entertainment Hot List." (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.) During the summer of 2005, Plaintiff was not happy with her work at MSNBC. (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.) At some point during the summer of 2005, Plaintiff began to think about leaving MSNBC. (*See* Rikelman Decl. Ex. 1, Deposition of Claudia DiFolco ("DiFolco Dep. Tr.") at 144:15–24.) On August 22, 2005, Plaintiff returned from a vacation in Europe. (Def. 56.1 ¶ 6.) On that same day, Plaintiff received a voice mail message from one of her producers at the time, Cassandra Brownstein,[2] that Plaintiff found to be condescending and that she thought accused her of missing work. (Def. 56.1 ¶ 4, 7; Pl. 56.1 ¶ 7.)

At 10:07 a.m.[3] on August 23, 2005, Plaintiff sent an email (the "August 23 email") to Mr. Kaplan that stated in part:

> left a msg [sic] at your office yesterday ... i'm planning on working out of nj next Friday 9/2, so i can meet with you, at your convenience, anytime thursday. unfortunately, it really saddens me to say that after much considerable thought, it is to discuss my exit from the shows. you have been nothing but supportive and mentoring of me since the day we met and i want to make sure i do this in the least disruptive manner possi-

ble and give you ample time to replace me.

> \* \* \*

> rick, i really wanted this to work and more importantly, wanted to be a part of your team for a long time to come. i'm so sorry.

(Rikelman Decl. Ex. 4 (lowercase and first ellipsis in original).) At 2:59 p.m., Mr. Kaplan wrote to Mr. Leon, "Do nothing til [sic] I say something." (Pearson Decl. Ex. 19.) At 9:02, Mr. Kaplan responded to Plaintiff's email, "Sorry to hear this ... but I'll see you when you're here." (Rikelman Decl. Ex. 4 (ellipsis in original).) The call logs of Plaintiff's talent agent, Ken Lindner ("Mr. Lindner"), indicate that Plaintiff spoke with Mr. Lindner several times on the afternoon of August 23, 2005. (Rikelman Decl. Ex. 5; Declaration of Ken Lindner ("Lindner Decl.") ¶ 4.)

The morning of August 24, 2005, Plaintiff forwarded to Mr. Lindner her August 23 email to Mr. Kaplan with a cover note stating:

> ken, i should have let you know about this letter earlier, but i just couldn't take it anymore. i tried so hard to fix this....

> from my perspective, and others' who have worked with scott, past and present, the environment is toxic and the situation hopeless. please call me to discuss ...

(Rikelman Decl. Ex. 6 (lowercase and ellipses in original).) Later on August 24, 2005, Plaintiff sent a second email to Mr. Kaplan (the "August 24 email") that stated

---

DiFolco's Opposition to Defendants' Motion for Summary Judgment ("Pearson Decl.").

**2.** Ms. Brownstein was originally named as a defendant in this case, but all claims against her were dismissed due to Plaintiff's failure to serve Ms. Brownstein properly. *DiFolco v. MSNBC Cable L.L.C.*, No. 06 Civ. 4726, 2007

WL 959085, at *8 (S.D.N.Y. Mar. 30, 2007), *vacated in part on other grounds*, 622 F.3d 104 (2d Cir.2010).

**3.** Neither Plaintiff nor Defendants verified whether Plaintiff's email time stamps corresponded to Pacific Standard Time or Eastern Standard Time.

in part, "[T]o be clear, i [sic] did not resign yesterday and was merely giving you significant notice of my intention so you could begin thinking about alternatives for next year. as [sic] always, count on my continued professionalism." (Rikelman Decl. Ex. 7.)

At 12:32 p.m. on August 28, 2005, Mr. Kaplan sent an email to Mr. Leon, copying Melissa Jones, in which Mr. Kaplan stated:

Let's cut our losses NOW . . . cancel her coming east . . . drop her off the show immediately . . . take her off payroll etc as of Friday . . . after all she resigned! I don't wish to meet with her, there's no reason now . . . but I will cancel with her once you all take the above actions. I don't want any on air goodbyes or anything like that . . . she just immediately disappears from the shows. Melissa: call her agent and inform him . . . and remember she quit . . . we owe her NOTHING!!!

(Pearson Decl. Ex. 13 (ellipses in original).) At 2:48 p.m. on August 28, Mr. Kaplan responded to Plaintiff's August 24 email, stating:

My complete impression is that you have resigned . . . and offered the courtesy of working out an exact out-date . . . I made Scott aware of t6his [sic] . . . and we feel that sooner is better since your obvious intent is to leave. Best for all to do it quickly . . . I'm disappointed . . . to say the least . . .

(Pearson Decl. Ex. 11 (ellipses in original); Rikelman Decl. Ex. 9.)

On August 31, 2005, Plaintiff sent a final email to Mr. Kaplan (the "August 31 email"), copying Mr. Lindner, in which she identified several workplace grievances and stated in part:

Since we have barely communicated through a few short e-mails, I don't understand how you could have developed such a "complete impression." It was my intention to give you long-term notice that I was terribly disappointed in the way I was treated and was not planning on returning for the second year of my contract.

(Rikelman Decl. Ex. 13.) Between August 23, 2005 and August 31, 2005, Plaintiff discussed her emails to Mr. Kaplan with at least nine people outside of MSNBC. (Def. 56.1 ¶ 26; Rikelman Decl. Ex. 1 at 188–91, 271–73, 281; *see also* Rikelman Decl. Exs. 6, 10, 12, 20.)

Following Plaintiff's emails, Mr. Kaplan directed that Plaintiff be removed from the MSNBC payroll in September 2005. (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23.) Plaintiff was subsequently placed on "suspend assignment" status by MSNBC on September 12, 2005, and was on MSNBC's employee payroll until September 16, 2005. (Pearson Decl. Ex. 14.)

On August 31, 2005, the website "Inside Cable News" reported the following:

FTV Live is reporting that Entertainment Hotlist and At The Movies host/reporter Claudia DiFolco quit MSNBC in the middle of her contract leaving Sharon Tay as the sole host of the show. FTV reports that her bio has been pulled off the website. This can't be a good omen for the future of the shows which have seen a noticeable downturn in publicity on the network recently.

(Rikelman Decl. Ex. 16; Pearson Decl. Ex. 17.) On September 1, 2005, the website "News Blues for TV News Insiders" ("News Blues") similarly reported, "Luscious Claudia DiFolco has quit MSNBC in the middle of her contract, leaving Sharon Tay as the sole host of 'Entertainment Hotlist' and 'At The Movies.'" (Rikelman Decl. Ex. 18; Pearson Decl. Ex. 18.) By the time of the September 1 News Blues report (the "September 1 report"), approximately 80,000 people could have viewed the August 31 Inside Cable News report

(the "August 31 report"). (Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27.)

On September 4, 2005, on the website TVSpy, an anonymous poster using the pen name "Jill Journalist" posted a comment entitled "Scott Leon real deal, DiFolco Defecto" that stated in part:

> Claudia DiFolco[ ] is one of the new breed of journalists who believes that cleavage, over time in the make up [sic] chair and a huge desire to become a star (instead of reporting on them,) is how you pay your dues. I have heard that throughout her irrelevant career at MSNBC, she constantly ignored directions from news producers during live shots, refused to do alternate takes for editing purposes, pouted like a spoiled child and never was a team player. Even the consumate [sic] professionalism of Leon and Sharon Tay, couldn't rub off on DiFolco. She was difficult in Phoenix, difficult in Secaucus, and reporters don't change their spots!

(Rikelman Decl. Ex. 17; Pearson Decl. Ex. 15.) By the time the September 4 TVSpy posting (the "September 4 posting") appeared, approximately 80,000 people could have viewed the August 31 and September 1 reports and been aware that Plaintiff had left MSNBC. (Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.)

Finally, on November 14, 2005, MSNBC sent Plaintiff a letter providing notice that pursuant to Paragraph 4(a) of the Contract, MSNBC was exercising its "unilateral right to terminate [the Contract] at the end of the first cycle by giving [Plaintiff] written notice not less than sixty (60) days prior to the end of such cycle." (Rikelman Decl. Ex. 15.)

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Kwan v. Schlein,* 634 F.3d 224, 228 (2d Cir.2011). The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). Where the moving party meets that burden, the, opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *F.D.I.C. v. Great Am. Ins. Co.,* 607 F.3d 288, 292 (2d Cir.2010). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lucente v. IBM Corp.,* 310 F.3d 243, 253 (2d Cir.2002) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

In considering a motion for summary judgment, the Court resolves all ambiguities and draws all reasonable inferences against the moving party. *Lindsay v. Ass'n of Prof'l Flight Attendants,* 581 F.3d 47, 50 (2d Cir.2009). To survive summary judgment "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)). "Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Rule 56 mandates summary judgment "against a party who fails to make a showing sufficient to estab-

lish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### B. Plaintiff's Breach of Contract Claims

Defendants assert that Plaintiff's August 23 email to Mr. Kaplan—confirmed in her August 31 email to Mr. Kaplan—constituted a notice of resignation and thus a repudiation of the Contract. *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 10–12. Plaintiff, however, asserts that she never intended to resign at that time and that she simply wanted Mr. Kaplan to "understand the urgency of her concerns" about her working conditions. (Plaintiff's Memorandum of Law in Opposition ("Pl. Br.") at 10; DiFolco Dep. Tr. at 170:9.) For the reasons discussed below, the Court concludes that material issues of fact remain concerning the reasonable interpretation of Plaintiff's emails.

#### 1. Repudiation of the Employment Agreement

 According to well-settled principles of contract law, an anticipatory repudiation excuses the non-breaching party from performance. *See, e.g., De Forest Radio Tel. & Tel. Co. v. Triangle Radio Supply*, 243 N.Y. 283, 153 N.E. 75, 78 (1926). Either "a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach" or a "voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach" can be a repudiation. *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 682 N.Y.S.2d 664, 705 N.E.2d 656, 659 (1998) (quoting Restatement (Second) of Contracts § 250). A party's repudiation of a contract is only effective when it is shown that "the an-nouncement of an intention not to perform was positive and unequivocal." *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 408 N.Y.S.2d 36, 379 N.E.2d 1166, 1168 (1978). "When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit." *Lucente*, 310 F.3d at 258 (citing New York cases); *see also Am. List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38, 550 N.Y.S.2d 590, 549 N.E.2d 1161, 1164–65 (1989). The Court may determine, as a matter of law, whether written communications constitute repudiation. *York Agents, Inc. v. Bethlehem Steel Corp.*, 36 A.D.2d 62, 318 N.Y.S.2d 157, 158–59 (1971). If a written communication is ambiguous, it presents an issue of fact. *See Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973).

 In her August 23, 2005 email to Mr. Kaplan, Plaintiff stated her desire to "discuss [her] exit from the shows" and give MSNBC "ample time to replace [her]." (*See* Rikelman Decl. Ex. 4.) In the same email, however, Plaintiff also stated that she was "planning on working out of [New Jersey] next Friday 9/2, so [I] can meet with you, at your convenience, anytime [T]hursday." (*Id.*) Mr. Kaplan testified that "the [August 23] e-mail read very clearly, to me, that [Plaintiff] quit." (Rikelman Decl. Ex. 14, Deposition of Richard Kaplan ("Kaplan Dep. Tr.") at 20:7–15.) In support of their argument that the August 23 email constituted a repudiation of the Contract, Defendants point to Plaintiff's deposition testimony in which she

stated that she "wanted [Mr. Kaplan] to believe that there could have been that possibility [that Plaintiff would leave], because I wanted him to take me seriously and fix the problems." (DiFolco Dep. Tr. at 169:19–170:3.) Plaintiff maintains, however, that her "intention was never to leave." (DiFolco Dep. Tr. at 170:4–9.) Rather, she wanted Mr. Kaplan to "understand the urgency of her concerns" and to be aware of the possibility that she might leave the shows in the future. (Pl. Br. at 10.)

Defendants also point to contemporaneous documents which they assert support Mr. Kaplan's interpretation of the August 23 email. For example, Mr. Lindner's call logs for two calls from Plaintiff on August 23, just hours after Plaintiff sent her first email to Mr. Kaplan, indicate that Plaintiff "decided she's leaving MSNBC" and that Plaintiff "expressed to rick kaplan [sic] that she's leaving." [4] (Rikelman Decl. Ex. 5; see also Rikelman Decl. Ex. 12.) However, the log also contains a note indicating "her email didnt 'say leavin toorrow [sic].'" (Rikelman Decl. Ex. 4.) [5] Defendants also point to the call logs of Karen Wang Lavelle ("Ms. Wang Lavelle"), another agent in Mr. Lindner's office, who also spoke with Plaintiff on August 30, 2005, about her emails to Mr. Kaplan. The log reflects that Plaintiff stated, "I was letting Rick Kaplan know that I was not going to be avail[able] for the 2nd year of my contract. I was giving him ample notice for the 2nd year, that I was not coming back." (Rikel-

man Decl. Ex. 12.) The log also reflects that Plaintiff stated, "I did NOT terminate my employment, I DIDN'T do that, why would [I]?" (Id.)

Finally, Defendants assert that Plaintiff's August 31, 2005 email to Mr. Kaplan confirms that Plaintiff had no intention of staying at MSNBC beyond the first year of the Contract. In that email, Plaintiff stated, "It was my intention to give you long-term notice that I was terribly disappointed in the way I was treated and was not planning on returning for the second year of my contract." (Rikelman Decl. Ex. 13.) But in the same email, Plaintiff also stated, "I was prepared for my upcoming stories and going to work when they were immediately cancelled." (Id.)

Many of Plaintiff's arguments are based on her assertion that she did not *mean* to resign by sending the emails to Mr. Kaplan. In a similar vein, Defendants point to Plaintiff's deposition testimony, the call logs from Mr. Lindner and Ms. Wang Lavelle, and Plaintiff's August 31 email as evidence that Plaintiff *intended* for Mr. Kaplan to believe she was resigning. The law is clear, however, that whether Plaintiff repudiated the Contract is based on an objective, not a subjective, standard. *See* Restatement (Second) of Contracts § 250 cmt. b (explaining that whether language qualifies as a repudiation turns on a "reasonable interpretat[ion]" and "fair reading" of that language). Thus, Plaintiff's subjective intent is irrelevant. Here, given the conflicting

---

**4.** In a sworn Declaration, Mr. Lindner stated that he "regularly took notes of conversations of phone calls with clients, to reflect the conversation." (Lindner Decl. f 3.) Mr. Lindner also stated that Plaintiff "told [him] that she had decided to advise MSNBC that she was leaving the network" and at the same time that "she had not resigned, but she had simply advised MSNBC that she would not be returning for the second year of her contract." (Lindner Decl. ¶ 4.)

**5.** Plaintiff testified that she did not recall speaking with Lindner that day. (Pearson Decl. Ex. 3, DiFolco Dep. Tr. at 158:18–22.) While Plaintiff's self-serving testimony that she does not recall the calls to Mr. Lindner is not enough to create a material issue of fact, *see Desir v. Bd. of Co-op. Educ. Servs.*, 803 F.Supp.2d 168, 177–78 (E.D.N.Y.2011), the call logs themselves do contain contradictory statements that require further clarification.

statements contained in the August 23 email that Mr. Kaplan purportedly relied on in making his decision that Plaintiff had resigned—*i.e.,* that Plaintiff both wanted to discuss her exit and at the same time was planning on working the following week—the Court cannot at this point conclude that based on the August 23 email Plaintiff's intent to resign was "positive and unequivocal." *Neuman,* 379 N.E.2d at 1168.[6] Similarly, while the call logs from Mr. Lindner and Ms. Wang Lavelle as well as Plaintiff's August 31 email lend support to the impression that Plaintiff did not intend to work for MSNBC beyond the first year of the Contract, both the call logs and the August 31 email contain other contradictory statements that preclude summary judgment at this point.[7] Ultimately, as the Court of Appeals held, whether Plaintiff communicated her intent to resign and whether Mr. Kaplan's interpretation of Plaintiff's communications as a resignation was reasonable are questions of fact for a jury to decide. *See DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 112–13 (2d Cir.2010). Accordingly, Defendants' motion for summary judgment as to the breach of contract claim is DENIED.[8]

### 2. Limitation on Potential Contract Damages

Defendants also seek to limit any potential recovery by Plaintiff to the first year of the Contract. The Contract provides that its term would be "divided into two (2) consecutive cycles of fifty-two (52) weeks each" and that MSNBC had "the right to terminate [the Contract] effective at the end of the first cycle by giving [Plaintiff] written notice not less than sixty (60) days prior to the end of such cycle." (Rikelman Ex. 2, Contract, ¶ 4(a).) Accordingly, the Contract gave MSNBC the unilateral right not to bring Plaintiff back for year two of the Contract. *See Bartel v. NBC Universal, Inc.,* 543 F.3d 901, 904–05 (7th Cir. 2008) (applying New York law and finding that identical language gave NBC unilateral right not to renew at end of cycle). On November 14, 2005, in response to Plaintiff's renewed request that she be paid for both years of the Contract, (Rikelman Decl. ¶ 23), MSNBC issued a notice to Plaintiff that the company was exercising its unilateral right to terminate the Contract after the first cycle. (*See* Rikelman Decl. Ex. 15.) Defendants assert that because MSNBC issued proper notice of termination, they should not be liable for damages, if any, beyond the first cycle of the Contract. While Defendants are correct that absent any breach of contract on their behalf, the Contract gave MSNBC the unilateral right to terminate the Contract after the first cycle, this issue ultimately turns in part on the jury's determi-

---

**6.** Adding to the uncertainty is Plaintiff's August 24 email that states, "to be clear, [I] did not resign yesterday and was merely giving you significant notice of my intention so you could begin thinking about alternatives for next year," (Rikelman Decl. Ex. 7), which might be construed as a retraction. *See* Restatement (Second) of Contracts § 256 (noting that a repudiation may be nullified "if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final").

**7.** That said, if a jury were to conclude that Plaintiff had repudiated the Contract or had affirmatively communicated her intent to breach in the future, MSNBC would have been justified in terminating her contract. *See, e.g., Lucente,* 310 F.3d at 258 (citing *Inter–Power of N.Y., Inc. v. Niagara Mohawk Power Corp.,* 259 A.D.2d 932, 686 N.Y.S.2d 911, 913 (1999)); *see also Am. List Corp.,* 549 N.E.2d at 1164–65.

**8.** Because Plaintiff's New York Labor Law claims turn on whether Defendants breached the Employment Agreement, those claims will also be permitted to go forward.

nation of whether Plaintiff first repudiated the Contract. Because the Court concludes that the breach of contract claim should go to a jury, the issue of whether to limit damages will depend, *inter alia*, on the jury's determinations as to Plaintiff's purported repudiation, Defendants' purported breach of the Contract, and the timing of any such breach. Accordingly, Defendants' motion for partial summary judgment as to damages is DENIED as premature.

### C. Plaintiff's Defamation Claims

Plaintiff also asserts claims for defamation under New York law. Plaintiff alleges that one or more of the Defendants was responsible for publishing three alleged defamatory statements that appeared on three independent websites between August 31, 2005 and September 4, 2005. Defendants deny that they made or had any connection with the alleged defamatory statements. Despite ample discovery, Plaintiff's claims suffer from a fundamental failure of proof—namely, Plaintiff has failed to proffer evidence to create an issue of fact as to whether Defendants were responsible for publishing the alleged defamatory statements.

■■ The New York Court of Appeals has stated that defamation is "the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [her] in the minds of right-thinking persons, and to deprive [her] of their friendly intercourse in society." *Foster v. Churchill*, 87 N.Y.2d 744, 642 N.Y.S.2d 583, 665 N.E.2d 153, 157 (1996) (citation and internal quotation marks omitted). Under New York law, "[a] claim for defamation requires plaintiffs to plead (1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) 'of and concerning' the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) either causing

special harm or constituting slander per se; and (7) not protected by privilege." *TC v. Valley Cent. School Dist.*, 777 F.Supp.2d 577, 603 (S.D.N.Y.2011) (citation omitted); *see also Dillon v. City of N.Y.*, 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (1999) (citing Restatement (Second) of Torts § 558). Truth, however, "provides a complete defense to defamation claims." *Dillon*, 704 N.Y.S.2d at 6.

■ Furthermore, because "only assertions of fact are capable of being proven false ... a [defamation] action cannot be maintained unless it is premised on published assertions of fact." *Brian v. Richardson*, 87 N.Y.2d 46, 637 N.Y.S.2d 347, 660 N.E.2d 1126, 1129 (1995). Thus, statements of opinion are generally not capable of being defamatory unless the plaintiff can show that "a defendant ... had knowledge of the falsity or probable falsity of the underlying facts." *Davis v. Ross*, 754 F.2d 80, 85–86 (2d Cir.1985) (quoting *Hotchner v. Castillo–Puche*, 551 F.2d 910, 913 (2d Cir.1977)).

■ Ultimately, whether a statement is defamatory presents a legal question for the court to determine. *See Dillon*, 704 N.Y.S.2d at 5. In addressing this question, New York courts must construe language "in the context of the entire statement or publication as a whole, tested against the understanding of the average reader." *Id.* If the statement is "not reasonably susceptible of a defamatory meaning, [it is] not actionable and cannot be made so by a strained or artificial construction." *Id.* "Loose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable." *Id.*

### 1. Plaintiff Has Failed to Produce Sufficient Evidence Linking Defendants to the Web Postings

■ On August 31, 2005, the website "Inside Cable News" reported the following:

FTV Live is reporting that Entertainment Hotlist and At The Movies host/reporter Claudia DiFolco quit MSNBC in the middle of her contract leaving Sharon Tay as the sole host of the show. FTV reports that her bio has been pulled off the website. This can't be a good omen for the future of the shows which have seen a noticeable downturn in publicity on the network recently.

(Rikelman Decl. Ex 16; Pearson Decl. Ex. 17.) Other than FTV Live,[9] no other source was indicated. On September 1, 2005, the website News Blues reported, "Luscious Claudia DiFolco has quit MSNBC in the middle of her contract, leaving Sharon Tay as the sole host of 'Entertainment Hotlist' and 'At The Movies.'" (Rikelman Decl. Ex. 18; Pearson Decl. Ex. 18.) Again, no source was given.

Days later, on September 4, 2005, someone writing as "Jill Journalist" posted an anonymous comment in the "Watercooler" section of the entertainment website TVSpy.com entitled "Scott Leon real deal, DiFolco Defecto" that stated in part:

> Claudia DiFolco, is one of the new breed of journalists who believes that cleavage, over time in the make up [sic] chair and a huge desire to become a star (instead of reporting on them,) is how you pay your dues. I have heard that throughout her irrelevant career at MSNBC, she constantly ignored directions from new producers during live shots, refused to do alternate takes for editing purposes, pouted like a spoiled child and never was a team player. Even the consumate [sic] professionalism of Leon and Sharon Tay, couldn't rub off on DiFolco. She was difficult in Phoenix,

difficult in Secaucus, and reporters don't change their spots!

(Rikelman Decl. Ex. 17; Pearson Decl. Ex. 15.)

Defendants assert that they are entitled to summary judgment of Plaintiff's defamation claims because Plaintiff has failed to produce any direct evidence that any Defendant made or published the alleged defamatory statements. Defendants denied under oath that they made the statements or that they had any knowledge of who was the source of the statements. (Kaplan Dep. Tr. at 74:19–76:10; Leon Dep. Tr. at 346:6–10, 357:5–9.) Plaintiff asserts that although there is no direct evidence linking Defendants to the statements, there is sufficient circumstantial evidence to create a material issue of fact. The Court disagrees.

First, despite ample opportunity for discovery, the record is devoid of any evidence that any Defendant ever had any contact with any of the above websites or their administrators. Plaintiff has proffered no emails, voicemails, testimony from website employees, or any other evidence linking any Defendant to the websites or the postings. Indeed, Plaintiff never requested information from Inside Cable News or News Blues and waited nearly six months before subpoenaing TVSpy, at which point the company had deleted any potential records. (Rikelman Decl. Ex. 21; *see also* [dkt. no. 65] ("[A]lthough Plaintiff's counsel began representing Plaintiff approximately three days after the discovery of the alleged[ ] defamatory web postings, counsel failed to subpoena information timely from any of the relevant websites.").)[10] Additionally, with

---

**9.** According to the "About Us" section of the website, FTVLive.com is a "TV [n]ews [i]nsider website" established in 2000 by blogger Scott Jones and based outside of Jacksonville, Florida. FTVLive.com, http://www.ftvlive. com/about.htm (last visited November 6, 2 011).

**10.** Plaintiff also did not name any of the three websites as defendants in her initial complaint.

respect to the Inside Cable News and News Blues reports, Plaintiff has proffered no evidence that any Defendant would have been able to post information independently on those websites.

Instead, Plaintiff attempts to salvage her defamation claims by asserting that one of the Defendants must be the source of the alleged defamatory statements because Defendants allegedly had the motive to harm her and the opportunity to do so because they were part of an alleged limited group of people who knew of Plaintiff's situation with MSNBC. But Plaintiff has cited no authority—and this Court has found none—in which bare allegations of motive and opportunity alone are sufficient to survive summary judgment where there is otherwise no record evidence tending to show that a defendant was the source of an alleged defamatory statement.[11] Indeed, as discussed below, what Plaintiff refers to as "circumstantial evidence" is nothing more than a reiteration of her unproven theory—based solely on her "beliefs," "imagination," and "common sense"—that Defendants must be responsible for making the alleged defamatory statements. Theories and beliefs, however, are not enough to survive summary judgment. Evidence is required.

At her deposition, Plaintiff was asked directly if she had any factual basis for asserting that Defendants were responsible for making the August 31 and September 1 statements. Plaintiff answered, "Common sense would say that Rick Kap-

lan was the source." (DiFolco Dep. Tr. at 262:10–11.) Counsel for Defendants inquired further:

Q: Do you know any facts that point to Rick Kaplan as the source of this posting? . . .

A: Yes.

Q: What facts do you know of?

A: [Mr. Kaplan] decided to falsely accuse me of quitting when I, in fact, had been fired.

Q: Any other facts that you know of?

A: That is a fact. No other facts that I know of.

(*Id.* at 262:14–263:8.) Simply stating that something is a fact, however, does not make it so. Plaintiff's assertions of "common sense" amount to nothing more than conclusory allegations that will not suffice to create a material issue of fact. *Cf. Albert v. Loksen*, 239 F.3d 256, 266 (2d Cir.2001).

Plaintiff was also questioned directly about her knowledge pertaining to the September 4 TVSpy posting:

Q: Do you know who Jill Journalist is?

A: No, I do not.

Q: Do you know any facts about the potential identity of Jill Journalist? . . .

A: I imagine it to be Cassandra Brownstein or Scott Leon.

Q: Okay. I'm not asking for what you imagine. I'm asking for what you know. Do you know who Jill Journalist is?

---

**11.** Plaintiff's reliance on *James v. DeGrandis*, 138 F.Supp.2d 402 (W.D.N.Y.2001) is not persuasive. In *DeGrandis*, the defendant admitted that he was aware that the alleged defamatory letter was being prepared and that it was going to be sent, but denied actually drafting the letter. Additionally, plaintiffs submitted prior letters that had been drafted by the defendant that were stylistically similar. *Id.* at 419. No such evidence has been proffered here. Additionally, Plaintiff's reli-

ance on *Blake–McIntosh v. Cadbury Beverages, Inc.*, No. 96 Civ. 2554, 1999 WL 464529, at *9 (D.Conn. June 25, 1999) is inapposite. In *Blake–McIntosh*, there was no question that the defendants had disseminated the alleged defamatory statement. Thus, the only issue was whether plaintiff could overcome defendants' claim of qualified immunity by showing that defendants had disseminated the statement with actual malice. This in no way excuses Plaintiff's failure of proof here.

A: I believe it is to be them, yes.... 

Q: Do you know for a fact that it was one of them or both of them?

A: If you read this posting, common sense would say yes.

\* \* \*

Q: [O]ther than what is in the posting itself, do you know of any facts tying either Cassandra Brownstein or Scott Leon to the [TVSpy posting]?

A: Other than what is common sense or obvious, no.

(DiFolco Dep. Tr. at 264:23–266:25.) Here again, Plaintiff's "imagin[ation]" and "belie[f]" that the statements are attributable either to Ms. Brownstein or Mr. Leon are insufficient to create a material issue of fact. Absent any record evidence, Plaintiff's claim based solely on "conjecture" and "speculation" must fail. *Kerzer*, 156 F.3d at 400.

Contrary to Plaintiff's "beliefs," discovery here has established that by the time the August 31 report appeared on Inside Cable News, at least nine people outside of MSNBC were aware of the subject of Plaintiff's late August emails with Mr. Kaplan, including six staff members at Ken Lindner & Associates, Plaintiff's fiancé, Plaintiff's sister, and a close personal friend. (*See* DiFolco Dep. Tr. at 188:17–191:24, 271:22–283:12; *see also* Rikelman Decl. Exs. 6, 10, 12, 20.)[12] Any one of these individuals could have mentioned Plaintiff's emails or circumstances to an acquaintance. *Cf. Riisna v. ABC*, 219 F.Supp.2d 568, 575 (S.D.N.Y.2002) ("Even if it were logical to infer that *something* came from [defendant], it would not be logical to infer that each rumor, in the form it reached the witness, in words or substance was what originated with [defendant]."). Furthermore, Plaintiff's assertion that she never characterized her dispute with MSNBC as a resignation is belied by the record. Plaintiff used the word "resign" in her August 24 email, and the contemporaneous notes of her agent reference repeatedly the word "quit." (*See* Rikelman Decl. Ex. 12.)

Similarly, by the time the September 4 posting appeared on TVSpy, Plaintiff acknowledges that at least 80,000 readers had already seen or had access to the previous reports of Plaintiff's departure from MSNBC on Inside Cable News and News Blues. (Pl. 56.1 ¶¶ 27–28; Pearson Decl. Ex. 1, Complaint ¶ 54.) Thus, it cannot be said that after August 31 only a limited group had access to that information. *See, e.g., Riisna*, 219 F.Supp.2d at 575 (noting that once plaintiff's departure was made public, "[a] simple process of putting two and two together" could have accounted for alleged defamatory rumors). More importantly, as noted above, the "circumstantial evidence" identified by Plaintiff regarding the contents of the September 4 posting amounts to little more than Plaintiff's unsubstantiated "belief" that Mr. Leon was the source. Even the unconfirmed alleged details of Plaintiff's and Mr. Leon's careers, the allegations of Plaintiff's on-the-job conduct, and the use of the term "Secaucus" as a reference to MSNBC can all just as easily be attributed to any person who had ever worked with either Plaintiff or Mr. Leon either at MSNBC or in Phoenix.[13] Plaintiff's un-

---

12. Moreover, after the August 31 posting, Plaintiff admits that at least 80,000 people would have had access to the information. (Pl. 56.1 ¶¶ 27–28; Pearson Decl. Ex. 1, Complaint ¶ 54.)

13. Plaintiff's assertion that the information in the TVSpy posting "would be known only by someone who worked closely with both Leon and DiFolco—Kaplan, Leon, and Brownstein" (Pl. Br. at 17), is unsupported by the record.

substantiated "belief" is simply not enough to establish a material issue of fact here. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348 (cautioning that non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" to create genuine issue of fact).

Here, while Plaintiff's conclusory allegations may raise an inference of defamation by some unidentified persons, they are insufficient to defeat Defendants' motion for summary judgment. *See, e.g., Riisna*, 219 F.Supp.2d 568; *Cooper v. Foster*, No. 88AP–326, 1989 WL 11941, at *3 (Ohio Ct.App. Feb. 14, 1989) (granting summary judgment because plaintiff did not adduce any evidence attributing the alleged defamatory statements to defendant). Plaintiff's "beliefs" are insufficient to establish a material issue of fact in the face of Defendants' direct testimony that they did not make the statements. *See, e.g., Albert*, 239 F.3d at 266 (finding conclusory allegations that statement was made insufficient to defeat summary judgment); *Schulman v. Cont'l Ins.*, 258 A.D.2d 639, 685 N.Y.S.2d 794, 796–97 (1999) (granting summary judgment where plaintiff "relied entirely on speculative hearsay and failed to adduce admissible evidence that the individual defendants published the defamatory statements"); *Elsky v. Hearst Corp.*, 232 A.D.2d 310, 648 N.Y.S.2d 592, 593 (1996) (dismissing defamation claims based on plaintiff's "conclusory, hearsay assertion that some unnamed individuals informed him" of the alleged defamatory statement). Accordingly, Defendants' motion for summary judgment as to Plaintiff's defamation claims is GRANTED.

### 2. The August 31, 2005 and September 1, 2005 Reports

Defendants are also entitled to summary judgment as to Plaintiff's defamation claims based on the August 31 and September 1 reports because the claims are barred by New York's single instance rule.

 In order to prove defamation under New York law, a plaintiff must provide evidence of special damages, which consist of the loss of something having economic or pecuniary value. *See Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 179 (2d Cir.2000). Under certain circumstances, however, New York recognizes certain types of statements as "defamation per se" and presumes that damages result from those specifically enumerated categories of statements. *Id.* Thus, actions for "defamation per se" are exceptions from the requirement to plead and prove special damages. *See id.* Here, Plaintiff does not offer any evidence of special damages and instead asserts that the August 31 and September 1 statements are defamatory per se.

 Under New York law, one category of statements recognized as defamatory per se are statements that tend "to disparage a person in the way of [her] office, profession or trade." *Id.* The New York Court of Appeals has circumscribed this category as "limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office" that "must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities." *Liberman v. Gelstein*, 80 N.Y.2d 429, 590 N.Y.S.2d 857, 605 N.E.2d 344, 348 (1992).[14] In the case of alleged

---

14. A leading treatise describes the quintessential examples of employment-related defamation per se as follows:

[I]t is actionable without proof of damage to say of a physician that he is a butcher . . ., of an attorney that he is a shyster, of a

defamatory statements regarding a reporter, the Court of Appeals has found that that statements reflecting on a reporter's "accuracy and fairness of reporting" and "trustworthiness" are the types of statements that can be considered defamatory per se. *Celle*, 209 F.3d at 185. Furthermore, New York courts have determined that general statements regarding an employee's resignation are not actionable. *See, e.g., Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F.Supp.2d 279, 287 (S.D.N.Y. 2006) (finding not actionable supervisor's statement to plaintiff's former colleagues that plaintiff resigned for "personal reasons"); *Nichols v. Item Publishers, Inc.*, 309 N.Y. 596, 132 N.E.2d 860, 862–63 (1956) (finding not actionable newspaper report that plaintiff was removed as pastor of church without assigning a reason for the removal).

■ New York, however, recognizes the "single instance rule" as a narrow exception to the category of defamation per se outlined above. *Celle*, 209 F.3d at 180. The rule applies "'where a publication charges a professional person with a *single error in judgment*, which the law presumes not to injure reputation.'" *Id.* (quoting *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d 825, 828 n. 5 (1995)). "[U]nder the 'single, instance' exception to [the per se rule], a statement charging another with a single dereliction in connection with his or her trade, occupation or profession does not necessarily charge that party with general incompetence, ignorance or lack of skill and is not deemed actionable unless special damages are pleaded and shown."

*Bowes v. Magna Concepts, Inc.*, 166 A.D.2d 347, 561 N.Y.S.2d 16, 17 (1990).

■ Here, even if the August 31 and September 1 reports stating that Plaintiff quit "in the middle of her contract" are actionable as defamation per se, the statements still refer only to one event—Plaintiff's alleged resignation from MSNBC. Such a report of Plaintiff's "single instance" of resigning—even in the middle of a contract—is not actionable under New York law absent allegations of special damages. *Id.* (noting further that allegations of general damages do not suffice). Accordingly, Plaintiff's defamation claims based on the August 31 and September 1 reports must be dismissed.

### 3. The September 4, 2005 TVSpy Posting

With respect to the September 4, 2005 TVSpy posting, Plaintiff's claims based on this posting must also be dismissed because the statement constitutes a non-actionable opinion and because Plaintiff has failed to proffer any evidence that any Defendant either made the statement or knew it to be false.

■ As previously noted, under New York law, "expressions of opinion are constitutionally protected." *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir.1985). When determining whether a statement is an opinion, a court must "read published articles in context to test their effect on the average reader, not to isolate particular phrases but to consider the publication as a whole." *See Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991),

---

school teacher that he has been guilty of improper conduct as to his pupils, of a clergyman that he is the subject of scandalous rumors, of a chauffeur that he is habitually drinking, of a merchant that his credit is bad or that he sells adulterated goods, of a public officer that he has accepted a bribe or has used his office for corrupt purposes . . .—since these things obviously discredit [one] in his chosen calling.

W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 112, at 791 (5th ed. 1984).

*cert. denied,* 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991).[15] As the Court of Appeals made clear in *Hotchner,* "[a]n assertion that cannot be proved false cannot be held libellous. A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be." 551 F.2d at 913. Accordingly, statements of "opinion[ ] based on false facts are actionable only against a defendant who had knowledge of the falsity or probable falsity of the underlying facts." *Id.; see also Davis,* 754 F.2d at 85–86.

■ Here, the complete context of the TVSpy posting—including its location on the "Watercooler" portion of the website, the anonymity of the writer, and the gossip-laden nature of the statements—would indicate to a reasonable reader that the statement represented the poster's opinion. *See, e.g., Brian,* 637 N.Y.S.2d 347, 660 N.E.2d at 1129–30 (noting that courts should "take into consideration the larger context in which the statements were published, including the nature of the particular forum" and the "identity, role and reputation of the author" to determine whether a reasonable reader would presume that the statement was conveying facts). Therefore, in order to survive summary judgment, Plaintiff must proffer evidence that the TVSpy posting's "negative characterization of [Plaintiff] is coupled with a clear but false implication that the author is privy to facts about [Plaintiff] that are unknown to the general reader." *Hotchner,* 551 F.2d at 913.[16] Plaintiff has failed to do so.

■ At her deposition, when asked if she knew who was responsible for the TVSpy posting, Plaintiff testified that she "imagine[d] it to be Cassandra Brownstein or Scott Leon." (DiFolco Dep. Tr. at 264:23–265:11.) Thus, based on Plaintiff's own testimony, Plaintiff must proffer evidence that either Mr. Leon or Ms. Brownstein, if indeed they were responsible for the statements, did not believe them to be true.[17] At his deposition, Mr. Leon was questioned directly about the TVSpy posting. Given the subjective nature of the posting, all of Mr. Leon's responses took the form of opinion or conjecture. (*See* Rikelman Decl. Ex. 19, Leon Dep. Tr. at 345:2–349:23.) For example, when discussing whether "Ms. DiFolco believed that cleavage was one of the ways she had to pay her dues as a journalist," Mr. Leon demurred, "[n]ot in my opinion." (*See id.* at 347:4–9.) In effect, Plaintiff asked Mr. Leon to verify the opinion of Plaintiff herself. When asked whether Ms. DiFolco "constantly ignored directions from news producers during live shots," Mr. Leon testified that though he could not speak for the producers of the other shows that

---

**15.** In determining whether a statement is one of fact or opinion, New York courts must consider the following three factors:

(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Brian,* 660 N.E.2d at 1129 (citations and internal quotation marks omitted).

**16.** This is particularly difficult here given Plaintiff's failure to proffer any evidence actually linking any Defendant to the anonymous posting.

**17.** Ms. Brownstein was never deposed. Thus, Plaintiff has failed to proffer any evidence of Ms. Brownstein's knowledge regarding the veracity of the statements. Similarly, Plaintiff has proffered no evidence of Mr. Kaplan's knowledge regarding the veracity of the statements.

Plaintiff worked on, he would not describe her conduct as constant. (*Id.* at 347:12–348:9.) Furthermore, when asked whether Plaintiff "pouted like a spoiled child," Mr. Leon testified only that he could "see where somebody would interpret some of her body language on camera when she was unhappy as pouting." (*See id.* at 349:9–17.)

None of this testimony establishes a genuine issue of material fact as to whether Mr. Leon—or any other Defendant, for that matter—knew the probable falsity of any of the opinions asserted in the September 4 posting. Instead, Mr. Leon's testimony stating his own opinions merely emphasizes the opinion nature of the TVSpy posting and does not raise an inference that Mr. Leon was either the poster or was "privy to facts about [Plaintiff] that are unknown to the general reader." *Hotchner,* 551 F.2d at 913. Accordingly, because Plaintiff has failed to show that there is a material issue of fact regarding any Defendant's knowledge of falsity of the TVSpy posting, the claim must be dismissed.

The Court has considered all the parties' additional arguments and finds them to be without merit.

### III. CONCLUSION

For the foregoing reasons, Defendants motion for summary judgment [dkt. no. 71] as to Plaintiff's claims is GRANTED IN PART and DENIED IN PART. Defendants' motion with respect to Plaintiff's defamation claims is granted in its entirety. Defendants' motion with respect to Plaintiff's breach of contract and New York Labor Law claims is denied.

SO ORDERED.